[Cite as *PNC Bank v. Bulldog Asset Recovery*, 2014-Ohio-4802.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 100692**

---

**PNC BANK, N.A.**

PLAINTIFF-APPELLEE

vs.

**BULLDOG ASSET
RECOVERY, ETC., ET AL.**

DEFENDANTS

[Appeal By Allen Youngman,
Defendant-Appellant]

**JUDGMENT:**
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-784578

**BEFORE:**   Blackmon, P.J., McCormack, J., and Stewart, J.

**RELEASED AND JOURNALIZED:**   October 30, 2014

**ATTORNEYS FOR APPELLANT**

Joseph W. Diemert
Diane A. Calta
Joseph W. Diemert & Associates
1360 S.O.M. Center Road
Mayfield Heights, Ohio 44124


**ATTORNEYS FOR APPELLEES**

**For PNC Bank, N.A.**

Donald A. Mauser
Weltman Weinberg & Reis Co., L.P.A.
Lakeside Place, Suite 200
323 Lakeside Avenue, West
Cleveland, Ohio 44113

**For Bulldog Asset, Etc. et   al.**

Mitchell J. Yelsky
Yelsky & Lonardo Company, L.P.A.
75 Public Square, Suite 800
Cleveland, Ohio 44113

**For Cuyahoga Corporation**

Cuyahoga Corporation, et al.
c/o Rick Slavik
2822 Cashwell Drive, Suite 234
Goldsboro, North Carolina 27534

**For Jacob Youngman**

Jacob Youngman
8047 Chagrin Road
Chagrin Falls, Ohio 44023

PATRICIA ANN BLACKMON, P.J.:

{¶1}    Appellant Allen Youngman ("Allen")[1] appeals the trial court's granting summary judgment in favor of appellee PNC Bank, N.A. ("PNC") and assigns the following three errors for our review:

> I.  The lower court erred in entering summary judgment, against Allen Youngman and in favor of the appellee, when it found appellant personally liable for a corporate debt without the requisite findings necessary to support a prima facie case of unjust enrichment.

> II.  The lower court erred in entering summary judgment, against appellant Allen Youngman, and in favor of the appellee, when it found appellant personally liable for a corporate debt without the requisite findings necessary to support a prima facie case of fraud.

> III.  The lower court erred in entering summary judgment, against appellant Allen Youngman, and in favor of the appellee, when it found appellant personally liable on a corporate debt without the requisite findings necessary to pierce the corporate veil under the *Belvedere* test.

{¶2}    After reviewing the record and relevant law, we reverse and remand the trial court's decision for further proceedings consistent with this opinion.   The apposite facts follow.

{¶3}    Bulldog Asset Recovery and Collection, L.L.C. ("Bulldog") was a limited liability company established by Jacob Youngman ("Jacob") and Ryan Cronin ("Cronin").   The company was in the business of recovering metal from construction sites and then reselling the material. Allen is Jacob's father and owned several scrap companies but claimed no ownership or managerial interest in Bulldog.

{¶4}    Bulldog opened a checking account with PNC.   The account registration and agreement named as authorized signatories to the account: Jacob, Allen, Cronin, and Office

---

[1]Because there are two Youngmans in this case, we will refer to each of them by their first names.

Manager Jessica L. Burnett ("Burnett"). Allen contends he was merely a "back-up signatory" to the account in case his son and Cronin were not available and was never given the account agreement to read. Burnett testified to the same. Allen also argued that as Jacob's father, he was an informal advisor for the company.

{¶5} On August 25, 2011, a $300,000 check executed by Rick Slavik and drawn on an account held by Cuyahoga Corporation at First Bank was deposited into Bulldog's PNC checking account. Allen did not know Rick Slavik, who was a friend of Cronin's father. In his deposition, Cronin guessed that the check was for the purchase of a project from Bulldog that was located in Detroit.

{¶6} Bulldog began to immediately write checks against this amount before it was returned for insufficient funds five days later. As a result, the Bulldog bank account was overdrawn in the amount of $218,146.21. The checks attached to PNC's motion for summary judgment were as follows:

(1) Check No. 2971    Martin Enterprises    $15,000

(2) Check No. 2972         Serpentine                    $31,700

(3) Check No. 2973    Jessica Burnett         $2,115

(4) Check No. 2974    SRS Realty              $4,000

(5) Check No. 2975    Jacob Youngman        $1,000

(6) Check No. 2976    Jacob Youngman        $5,000

(7) Check No. 2977    Allen Youngman         $5,000

(9) Check No. 2978    Recycling Concepts  $10,539

(10) Check No. 2979  Shaker Auto Lease    $5,479

(11) Check No. 2980  Granger Trucking      $10,000

(12) Check No. 2981   Stone Products                    $15,000

(13) Check No. 2983   BWC State Insurance $4,223

(14) Check No. 2984   BWC State Insurance $7,825

{¶7}     In an effort to redress the deficiency, several of the defendants contributed money in an attempt to pay PNC for the overdrawn amount.  However, a balance of $178,540.75 remained in PNC's overdraft account. The total amount of the above checks is $116,881, and PNC does not state what constitutes the remaining balance.

{¶8}     On June 8, 2012, PNC filed a complaint against Bulldog, Jacob, Burnett,[2] Cronin,[3] Cuyahoga Corporation,[4] Rick Slavic,[5] and Allen.  PNC subsequently amended the complaint to remove Jacob from the complaint after Jacob filed for Chapter 7 bankruptcy protection.

{¶9}     This appeal only involves PNC's claims against Allen because Bulldog did not file an appeal.  The basis of PNC's claims against Allen are that he was unjustly enriched, perpetrated fraud against PNC, and should be held personally liable for the damages to PNC pursuant to the piercing of the corporate veil doctrine.

{¶10} After conducting discovery, PNC and Allen filed cross motions for summary judgment.  Allen  argued that he had no ownership interest in Bulldog and was just a signatory to the bank account and an informal advisor to the company.  He claims he did not benefit from

[2]PNC dismissed its claims against Burnett without prejudice.

[3]PNC entered into a settlement with Cronin.

[4]PNC did not obtain service on Cuyahoga Corporation.

[5]PNC obtained a default judgment against Slavik.

any overdrafts and had no knowledge regarding the state of Bulldog's account. PNC contended that Allen was more involved in Bulldog than he claimed. PNC argued Allen benefitted from the overdrafts because the Bulldog account was used by Allen for his own benefit and for the benefit of his own companies. The trial court denied Allen's motion for summary judgment and entered judgment in favor of PNC without opinion.

## Standard of Review

{¶11} We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 746 N.E.2d 618 (8th Dist.2000), citing *Smiddy v. The Wedding Party, Inc*., 30 Ohio St.3d 35, 506 N.E.2d 212 (1987); *N.E. Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs*., 121 Ohio App.3d 188, 699 N.E.2d 534 (8th Dist.1997). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶12} Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party.

## Unjust Enrichment

{¶13} In his first assigned error, Allen argues that the trial court erred by granting summary judgment on PNC's unjust enrichment claim. Allen specifically argues that he received no benefit from the overdrawn check except for the $5,000 as repayment for a personal loan he advanced to Bulldog.

{¶14} Unjust enrichment occurs where "'a person has and retains money or benefits which in justice and in equity belong to another.'" *Smith v. Vaughn*, 174 Ohio App.3d 473,

2007-Ohio-7061, 882 N.E.2d 941, ¶ 10 (1st Dist.2007), quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20. The purpose of an unjust enrichment claim is not to compensate the plaintiff for loss or damage suffered by the plaintiff, but to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it. *Johnson* at ¶ 21, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954). Restitution is the remedy provided upon proof of unjust enrichment "to prevent one from retaining property to which he is not justly entitled." *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 256, 141 N.E.2d 465 (1957); *see also Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, 801 N.E.2d 441, ¶ 11 ("restitution [is] available as the remedy for an unjust enrichment of one party at the expense of another"), citing Restatement of the Law, Restitution, Section 9 (1937).

{¶15} To prevail on a claim for unjust enrichment, a plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant retained that benefit under circumstances in which it would be unjust for him to retain that benefit. *Johnson* at ¶ 20, citing *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984).

{¶16} PNC's claim of unjust enrichment against Allen is based on the $5,000 check he received from Bulldog and the checks paid to creditors from Bulldog's account that PNC claims are tied to Jayco, a company owned by both Allen and Jacob. However, according to Allen, the $5,000 he received from Bulldog was for the repayment of a personal loan he made to the company. Admittedly, there is no documentation of the loan; therefore, whether the amount was for repayment of the loan presents an issue of fact.

**{¶17}** We also conclude that the evidence is far from conclusive concerning PNC's claims that the checking account was used to pay Jayco's debts. PNC cites to Office Manager Jessica Burnett's testimony to support its allegation that the bank account was used by both Jayco and Bulldog; however, Burnett did not testify to this. She stated that she was "pretty sure all the bills paid out of the Bulldog account were Bulldog's bills." Depo. at 44. She explained that she was not surprised that Stone Products, which was a Jayco bill, was charged to Bulldog because she was told that after January 2011, everything was to be switched over to Bulldog. She further explained that "Jake and Allen owned Jayco, but it was pretty much just Jake." Depo. at 47. Thus, Burnett's testimony does not show that Jayco used Bulldog's account or that Allen benefitted from the account. Rather, her testimony was that Bulldog took over Jayco. No evidence was presented whether Allen's interest in Jayco was transferred to Bulldog.

**{¶18}** Allen testified that his role at Bulldog was as a father of Jacob and advisor and that he had no ownership interest in Bulldog. He stated that he and his son had been 50% shareholders of Jayco. He detailed the history of Jayco. Jayco was established in 2002 to hold the shares of Cleveland Scrap, another company owned by Allen and Jacob. Gradually, the Cleveland Scrap shares were removed from Jayco. Allen stated that Jayco at that point was no longer a working entity but was held as an "open corporation." Jacob then used the Jayco name to start a reclamation project on West 130th Street. Jayco eventually became Bulldog with Jacob and Cronin owning the company. According to Allen, Jayco is no longer operating. Allen also testified that when Jayco was operating, its bank account was with FirstMerit, not PNC.

**{¶19}** Thus, the evidence only shows that Bulldog was created out of Jayco. No evidence was presented whether Allen's interest in Jayco was transferred to Bulldog, or whether

anything was filed with the state of Ohio to register the Bulldog entity or to dissolve the Jayco entity.

{¶20} PNC claims the fact that Allen was a signatory on the account also shows he was involved in the operation of Bulldog. Allen stated he was merely a signatory on the PNC account so that he was available to sign checks if Cronin and Jacob were unavailable. He claimed he was never presented with the account agreement and that he never reviewed the bank statements. Burnett also testified she was also a listed as a signatory on the account as a back up signatory and held no interest in the company. Thus, the fact Allen was a signatory, in and of itself, does not prove that Allen was involved in Bulldog's operations.

{¶21} PNC also contends that the fact that Bulldog used the same employees used by Allen showed that Bulldog was a sham corporation. However, as stated above, it is not clear if Burnett ever worked for Jayco because she stated that Jayco had become Bulldog at the time she started working there. She had worked for Cleveland Scrap from 2007 to 2011, but it is unclear whether it was simultaneously with Bulldog because she started to work for Bulldog in 2011.

{¶22} Cronin also testified that he worked for Jayco for a short time while he was waiting for Bulldog to be formed. He admitted that Bulldog used the address for Cleveland Scrap on East 55th Street, from December 1, 2011, to December 20, 2011, but does not know why. However, this use of the address for 20 days does not prove that Jayco was using Bulldog's funds. Burnett testified that when she worked for Bulldog, it was out of a trailer located at Valley View; Allen's business ventures used an address on East 55th Street and Miles Avenue.

{¶23} Burnett also stated that Jacob was her boss at Bulldog. She was paid by Bulldog and received a W2 from Bulldog for her work at Bulldog, not Jayco or Cleveland Scrap. Although Patrice Glause was the comptroller for various companies owned by Allen, Burnett

clarified that it was "just her" at Bulldog and that she did "everything." Depo. at 12. When the check bounced, however, Patrice Glause took over managing the finances and Burnett was laid off.

{¶24} Burnett's testimony also does not show that Allen was involved in Bulldog's operations. She did state that both Allen and Jacob directed her to pay Jayco's bills, but that could simply have been because Jayco's debts were transferred to Bulldog due to the merger. She also stated that Jacob "owned Bulldog" and handled the business side of things, while Cronin was responsible for finding the projects. Nothing was said of Allen's part in the business. According to Burnett, Jacob would tell her which vendors to pay and that she "had to go through Jake to pay anything."

{¶25} PNC also argues that the fact Allen paid approximately $12,000 to the BWC State Insurance Company once those checks were overdrawn showed he had more interest in the company than merely as an adviser. Allen does not recall making the payments, but Burnett stated that the payments were for payroll taxes. She stated that because the Bulldog checks bounced and Jacob had no money, his father paid the taxes using his credit card. She could not recall anything else paid by Allen.

{¶26} A review of the checks attached to PNC's motion for summary judgment also do not show that Allen benefitted unless we accept PNC's speculative conclusion that Bulldog was a sham corporation for Jayco. Except for the $5,000 check to Allen and the $15,000 to Stone Products, it appears the remaining checks were written exclusively for Jacob's or Bulldog's benefit.

{¶27} Burnett testified that she believed the checks were written for the following debts: the $31,700 to Serpentini was for Rick Slavik's truck; the $2,115 to her was because Jacob had

asked her to take cash out on his behalf (which he did frequently); the $4,000 to SRS was to pay SRS a commission for locating property for Bulldog projects; she did not know what the $10,539 check to Recycling Concepts was for, but acknowledged that Cronin was the owner of Recycling Concepts; and the $5,479 to Shaker Auto Lease was for Jacob's vehicles. There is no evidence that any of these checks benefitted Allen.

{¶28} Burnett was not sure what the check to Martin Enterprises for $15,000 and Granger Trucking for $10,000 were for; however, this does not lead to the conclusion that they must have been paid for Allen's benefit. No invoices were submitted detailing what debts were paid by the checks. Moreover, Cronin testified that the check for Martin Enterprises was probably payment for equipment rental for Bulldog and that Bulldog used Granger Trucking to haul the materials retrieved from the sites.

{¶29} It is true that Allen became involved in trying to rectify Bulldog's financial and legal problems after the $300,000 check bounced, but he readily admitted that he was an advisor to Bulldog and the father of Jacob. Therefore, his actions in trying to resolve the problems after the check bounced does not clearly implicate him as having benefitted from Bulldog's account.

{¶30} We conclude a review of all this evidence does not support granting summary judgment in PNC's favor for unjust enrichment. There are clearly issues of material fact regarding whether Jayco was subsumed into Bulldog and what happened to Allen's interest in Jayco. Accordingly, Allen's first assigned error is sustained.

**Fraudulent Conveyance**

{¶31} In his second assigned error, Allen argues the trial court erred in granting summary judgment as to PNC's fraud and fraudulent conveyance claims. We agree.

**{¶32}** To prove fraud, a plaintiff must establish, (1) a representation (or concealment of a fact when there is a duty to disclose), (2) that it is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance. *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶ 27, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986).

**{¶33}** PNC asserted that Allen worked in concert with the other defendants to defraud PNC of the funds paid from the checking account. There is absolutely no evidence beyond speculation that Allen was aware the account was in default at the time he received the $5,000 check or that he knew the $300,000 check would bounce. Nor was any evidence presented that he concealed the state of the account or misled others into relying upon it. No evidence was presented that he wrote any of the checks, and as we stated above, there was evidence that the bulk of the checks were written by Jacob for his personal benefit or the benefit of Bulldog.

**{¶34}** As we stated above, there are issues of fact regarding PNC's contention that Allen played a bigger role at Bulldog than he claims, or that Allen used the account to pay for the bills of Jayco. Viewing the evidence most strongly in favor of Allen, as the Civ.R. 56(C) requires, we cannot conclude that reasonable minds can reach only one conclusion that is adverse to Allen. Accordingly, Allen's second assigned error is sustained.

### Piercing of Corporate Veil

**{¶35}** In his third assigned error, Allen argues the trial court erred by concluding he was personally liable for Bulldog's debt by piercing Bulldog's corporate veil.

**{¶36}** We note at the outset, that although in its motion for summary judgment, PNC titled its corporate veil argument as including Allen, it developed the argument as it relates to Cronin, not Allen (see PNC's motion for summary judgment at 18, 19, and 25.)

**{¶37}** Nonetheless, summary judgment would have been inappropriate on the claim. To "pierce the corporate veil" and hold an individual personally liable for a corporation's debt, a plaintiff must prove that: (1) the individual's control over the corporation is so complete that the corporation has no separate mind, will, or existence of its own; (2) the individual's control over the corporation is exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 289, 617 N.E.2d 1075 (1993), paragraph three of the syllabus.

**{¶38}** There was no evidence that Allen had complete control and domination over Bulldog as outlined in *Belvedere*. PNC claimed Allen was more involved in Bulldog's operation than he claimed. However, Allen claimed he was an informal advisor as Jacob's father and a signatory on the bank account. He testified that he had no knowledge of the day-to-day operations of the company and had no knowledge regarding the state of Bulldog's checking account. Merely because Allen and his son both were involved in the scrap business does not automatically mean their ventures were jointly held. More evidence would be needed in order to hold Allen liable under the doctrine of piercing the corporate veil. Accordingly, Allen's third assigned error is sustained.

**{¶39}** Judgment reversed and remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

TIM McCORMACK, J., and
MELODY J. STEWART, J., CONCUR