[Cite as *DePompei v. Santabarbara*, 2015-Ohio-18.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 101163

**JOHN DEPOMPEI**

PLAINTIFF-APPELLEE

vs.

**KATHLEEN SANTABARBARA, ETC., ET AL.**

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-12-796773 and CV-12-796774

**BEFORE:** McCormack, J., Jones, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** January 8, 2015

**ATTORNEY FOR APPELLANT**

Scott H. Ballou
51 Landings Way
Avon Lake, OH 44012


**ATTORNEYS FOR APPELLEE**

Robert D. Anderle
Gary A. Ebert
Seeley, Savidge, Ebert & Gourash Co., L.P.A.
26600 Detroit Rd., 3d Floor
Cleveland, OH 44145

TIMOTHY J. McCORMACK, J.:

{¶1} Defendant-appellant, Kathleen Santabarbara, executor of the estates of Lambert ("Lambert") and Margaret DePompei ("Margaret"), appeals the judgment of the trial court for plaintiff-appellee, John DePompei ("John"), in an action alleging, alternatively, breach of an oral contract and/or unjust enrichment. On appeal, Santabarbara assigns seven errors for our review:

> I. The trial court erred in finding that an oral contract existed when there was no credible evidence of the necessary elements of a contract under Ohio law, thus making the finding of an oral contract against the manifest weight of the evidence.

> II. The trial court erred by finding that Margaret DePompei or her estate had been unjustly enriched where there is absolutely no evidence that she received any funds or benefit from the plaintiff or that she had any knowledge of the same, thus mak[ing] the finding against the manifest weight of the evidence.

> III. Assuming arguendo that a claim of unjust enrichment existed against Margaret DePompei or her estate, then the trial court erred in finding the amount of such enrichment to be one hundred and twenty two thousand dollars ($122,000.00) when there was no credible evidence of that amount being provided to Margaret DePompei or her estate, thus making that finding against the manifest weight of the evidence.

> IV. The trial court erred in failing to continue the trial when defendants had not been afforded complete discovery or the benefit thereof; the trial court erred in failing to continue the trial for one day so that additional important witnesses could be produced by defendants, thereby depriving them of their right to a fair trial; the totality of the same indicate an abuse of discretion by the trial court judge.

> V. The trial court erred by failing to state its judgment with particularity against each defendant, thereby making its judgment unenforceable.

> VI. The trial court erred by sustaining both a claim of unjust enrichment and an oral contract claim against the estate of John DePompei.

> VII. The trial court erred by sustaining both a claim of unjust enrichment against the estate of Margaret DePompei and an oral contract claim against the estate of John DePompei.

**Procedural History**

{¶2} On December 3, 2012, John filed separate complaints against Lambert's estate and Margaret's estate, which the trial court consolidated. A bench trial was held on September 19, 2013. At trial, the court heard the testimony of the following: John DePompei; John's granddaughter, Drue Hoffman; John's son, Attilio DePompei; Lambert's son, Mark DePompei; Lambert's attorney, Mark Wagner; and the executor of both estates, Kathleen Santabarbara. After hearing the evidence presented at trial and considering the exhibits and briefs submitted by the parties, the trial court issued its findings of fact and conclusions of law and entered judgment in favor of John DePompei, and against the estates of Lambert and Margaret DePompei, in the amount of $122,000.

{¶3} In its order, the trial court addressed each of the plaintiff-appellee's theories of recovery.[1] It found that the "words, deeds, acts, and silence of the parties" indicated that the parties had an oral contract that was breached. The trial court also found that the evidence demonstrated that the estates of Lambert and Margaret were both unjustly enriched, stating that John conferred a benefit on both Lambert and Margaret by loaning them money so that they may purchase a home. The court noted that, although the checks were written to Lambert, Margaret was the joint owner of the home, Margaret moved the real estate out of Lambert's estate through the Affidavit of Surviving Spouse when Lambert passed away, at the time the transfer was made, the executor of Lambert's estate had notice of John's claim, and there is evidence that the loan was for the benefit of both Lambert and Margaret. Therefore, the court concluded, "it would be unjust under the circumstances for the estates to retain that benefit without some form of

---

[1] The trial court's judgment included a determination that, in the alternative, John had a valid claim of promissory estoppel. Santabarbara, however, did not appeal the court's decision on this theory of recovery. We therefore will not address it in this opinion.

payment because the overwhelming testimony is that [John] never intended the money as gifts" and the brothers were attempting to finalize loan details when Lambert and Margaret passed away.

## Substantive Facts

{¶4} John DePompei is an elderly gentleman in his nineties who lives with his son, Attilio DePompei. Beginning in 2006, John's granddaughter, Drue Hoffman, began assisting John with his financial affairs, which included managing medical bills, financial and legal documents, estate planning, and general household matters.[2]

{¶5} It is undisputed that from September 2009 to June 2011, John issued six checks to Lambert ($5,000, $20,000, $15,000, $2,000, $20,000, and $60,000), totaling $122,000, which were endorsed and cashed by Lambert. John specifically testified that the check dated June 15, 2011, in the amount of $60,000 was a loan for the purchase of a home that Lambert and Margaret purchased in 2011. John repeatedly testified that the six disbursements were not gifts; rather, they were interest-free loans, and that Lambert had agreed to make payments on the loans. John stated that he expected to be paid back in full. He testified that he loaned Lambert the money in good faith because Lambert asked to borrow money "many times" because he was "out of work." John asserted that he trusted Lambert as a brother. According to John, Lambert agreed to make monthly payments. Lambert failed to make any payments to John.

{¶6} John further testified that he never signed a purported "gift letter" of $71,866.80 (identified as plaintiff's exhibit No. 14), dated July 18, 2011, and he never disbursed a check to

---

[2] Drue Hoffman is also employed by the law firm that has represented her grandfather in various matters, including estate planning, since 2006. She is the executive legal assistant for attorney Greg Seeley, and her duties include managing email correspondence, scheduling appointments, and editing and reviewing contracts and negotations for Seeley.

Lambert in that amount. John's granddaughter, Drue, also testified that the "gift letter" was never presented to John's attorney for his review. She said that she had not seen the letter until litigation had commenced. She further stated that the signature on the letter did not belong to her grandfather.

{¶7} Drue testified that John had a "substantial estate" that amounted to approximately $300,000 and included John's savings and an inheritance John received in 2009. She stated that in the course of helping her grandfather, she became aware that funds were being disbursed to John's brother, Lambert, between 2009 and 2011. She stated that she had several discussions with her grandfather about "everything being repaid," as well as discussions with her father, her aunts, and her uncles. She became concerned about the disbursements and advised John to seek the advice of an attorney and to document the payments to Lambert. Drue testified that she understood these payments to Lambert were loans to be used by Lambert and Margaret for the purchase of a home.

{¶8} Drue also testified that she repeatedly attempted to gather all of the family members to discuss the terms of the loan payments to no avail, stating that Lambert and his family refused to meet. She sought help from Debbie Testa, a financial planner, as an intermediary to discuss the loans with Lambert and Margaret. Testa had previously assisted John, Lambert, and Margaret in their financial matters. An email conversation between Drue and Testa (plaintiff's exhibit No. 8), dated June 22, 2011, demonstrated that the terms of a repayment structure were relayed to both Lambert and Margaret.

{¶9} Attilio DePompei, John's son, has lived with his father since 2006. Attilio testified that he was present on Memorial Day weekend in 2011 when his father John and his uncle Lambert discussed the possibility of Lambert purchasing a home. He testified that there was no

discussion of a gift at that time. Attilio further testified that on June 13, 2011, he overheard a telephone conversation that John was having with Lambert during which John was speaking of loaning Lambert the funds for a down payment on a house. Finally, Attilio witnessed a conversation in August 2011 where John learned that Lambert had no intention of paying John back. Attilio stated that John hung up on Lambert and he became so distraught that he cried.

{¶10} Mark DePompei, Lambert's son, testified that, on behalf of his father, he corresponded with John's attorney, Greg Seeley, regarding the terms of the loan for the purchase of a house for Mark, Lambert, and Margaret. In an email dated June 24, 2011, he stated as follows:

> My uncle, John DePompei, as you know, graciously offered us a loan from his Trust Fund to finance a home we wish to purchase in Lyndhurst, Ohio.
>
> My father and I discussed with my uncle borrowing $130,000.00 from his Trust Fund.
>
> The terms we talked about were an interest-free loan in the amount of $130,000.00 to be paid over 18 years at the rate of $602.00 per month (payment terms were renegotiated with my uncle on 6/21/11).
>
> The loan is to be repaid directly to the Trust with my uncle's daughter Patricia (Pasqua) Little as the sole executor of said Trust.
>
> My uncle was to contact you to draw up the papers which once complete would be forwarded to my father, my mother, and I to review with our attorney * * *.

(Plaintiff's exhibit No. 9.)

{¶11} Mark acknowledged that the funds disbursed by John were to be a loan for the benefit of Mark, Lambert, and Margaret, and he confirmed Margaret's participation in the loan discussions. He testified that he, Lambert, and Margaret planned to live in the house together and, while his parents were alive, the three of them would share responsibility for the loan, and once his parents passed away, Mark would "take ownership at that time." In response to Mark's

email request, Seeley drafted a land contract that, in Seeley's opinion, "best suit[ed] the purposes of this transaction, the parties, and it preserves the assets of the trust."

{¶12} Mark testified that he and Lambert reviewed the land contract forwarded by Seeley, and they objected to the terms of the document. Mark stated that they "reneged" on the $130,000 loan from John, and instead, his parents secured a loan from The Home Savings and Loan Company of Youngstown for the purchase of their home. Mark admitted that Drue had attempted to contact him regarding the loan, but he failed to respond to her requests. Mark testified that he was unaware of any monies being dispersed to Lambert until the time he moved into the home, when he alleges that his father told him about "a gift of $60,000 that my uncle made to my father."

{¶13} Mark Wagner, an attorney who represented Lambert in 2011, testified that Lambert retained Wagner's services in September 2011 for the purpose of drafting a promissory note in order to "sett[le] a family matter between him and his brother." Wagner testified that Lambert advised him that John had given him money, which caused family disharmony, and in the interest of family peace, Lambert and John had discussed Lambert's repayment of some of the money John had disbursed to Lambert. Wagner was not aware of the existence of a purported "gift letter" of $71,866.80 until litigation had commenced. And while he was not aware of a specific loan amount of $130,000, he stated that in September, he learned from Lambert that the parties had engaged in prior negotiations concerning a loan repayment plan between John and Lambert. According to Wagner, Lambert believed John had been paying him for reimbursement for the liquidation of a family winery business for which Lambert had not been compensated, in addition to repayment for free medical services Lambert had provided to John's family in previous years.

{¶14} In October 2011, Wagner drafted a promissory note for the repayment of $40,000, in which Lambert was the designated borrower. In the event of Lambert's death, the terms of the note provided that a repayment schedule would end and there would be no further liability on the note. Wagner forwarded the note to John's attorney, Seeley, for review. According to Drue, the terms of the note were unacceptable to John and he therefore did not sign it. Shortly after the note was prepared, Lambert and Margaret passed away within a short time of each other due to injuries suffered in an automobile accident.

{¶15} On October 30, 2011, Lambert passed away, and on November 6, 2011, Margaret passed away. Prior to their deaths, however, Lambert and Margaret entered into an agreement to purchase a home on Roland Road. Both Lambert and Margaret signed the agreement as buyers (plaintiff's exhibit No. 7). They paid $2,000 earnest money from a joint checking account. The purchase price of the house was $180,000. Lambert and Margaret obtained a loan for $120,000 from The Home Savings and Loan Company of Youngstown for the purchase of this home, which both Lambert and Margaret signed as borrowers. The additional balance due and owing was therefore $60,000. On June 15, 2011, as previously discussed, John issued a check to Lambert for $60,000. John testified that this check was for the down payment on Lambert's and Margaret's home.

{¶16} Kathleen Santabarbara, Lambert and Margaret's daughter, is the executor of her parents' estates. She acknowledged receipt of a notice of a claim against both estates made by her uncle, John, in December 2011. In January 2012, Santabarbara, as executor, executed an Affidavit of Surviving Spouse, which transferred Lambert's estate, including any interest in the Roland Road home and a bank account solely in Lambert's name containing approximately $7,000, into Margaret's estate. Attorney Wagner testified that the home was owned jointly with

Margaret, and upon Lambert's death, his interest in the property passed outside of probate to Margaret, who survived for a short time. When Margaret passed away, the interest in the home became included in Margaret's estate. At the time of trial, the home remained part of Margaret's estate, and Santabarbara, her brother Mark, and her husband were living in the home. Santabarbara testified that they had been paying the mortgage; they were not paying rent.[3]

## Standard of Review

{¶17} On a challenge to the manifest weight of the evidence in a civil case, a reviewing court does not weigh the evidence or judge the credibility of the witnesses. Rather, we must determine whether there exists competent and credible evidence in the record upon which the factfinder could base its decision. *Hawkins v. Green*, 8th Dist. Cuyahoga No. 96205, 2011-Ohio-5175, ¶ 9, citing *Abernethy v. Abernethy*, 8th Dist. Cuyahoga No. 92708, 2010-Ohio-435. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), at syllabus.

{¶18} Moreover, we are mindful of the presumption in favor of the finder of fact:

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

---

[3] According to plaintiff-appellee's brief, Mark DePompei lived in the Roland Road home until his death on June 6, 2014.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). "The knowledge a trial court gains through observing the witnesses and the parties in any proceeding (i.e., observing their demeanor, gestures and voice inflections and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record." *Friedland v. Djukic*, 191 Ohio App.3d 278, 2010-Ohio-5777, 945 N.E.2d 1095, ¶ 41 (8th Dist.).

## Oral Contract

{¶19} John claimed that he and his brother, Lambert, entered into an oral contract, or loan, for the repayment of the money he disbursed to Lambert from 2009 to 2011 in the amount of $122,000. Santabarbara, as executor of Lambert's estate, claimed that the monies from John were a gift and, therefore, the trial court erred when it found that an oral contract existed and Lambert breached the agreement by not repaying the funds.

{¶20} In order to succeed on a breach of contract claim, a party must prove the existence of a contract, the party's performance under the contract, the opposing party's breach, and resulting damage. *Hawkins*, 8th Dist. Cuyahoga No. 96205, 2011-Ohio-5175, at ¶ 10. Generally, damages in a contract action is the sum necessary to place the nonbreaching party in as good a position as he would have been had the contract been fully performed. *Id.*, citing *F. Ents., Inc. v. Kentucky Fried Chicken Corp.*, 47 Ohio St.2d 154, 351 N.E.2d 121 (1976).

{¶21} A contract is defined as a promise, or a set of promises, that is actionable upon breach. *Fine Line Communications, Inc. v. I. Schumann & Co.*, 8th Dist. Cuyahoga No. 93512, 2010-Ohio-1438, ¶ 17; *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58.

A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract. *Kostelnik*, at ¶16. The existence and the terms of an oral contract are issues for the trier of fact, and an appellate court will not reverse the trial court's decision when it is supported by some competent, credible evidence. *Mills v. Ralston*, 5th Dist. Stark No. 2001 CA 00129, 2003-Ohio-262, ¶ 27. These terms may be determined from the parties' words, deeds, and acts, as well as their silence. *Kostelnik* at ¶15. More specifically, in order to demonstrate that a transaction was a loan, the trial court may consider the relationship of the parties and an individual's need for the loan. *Saum v. Moenter*, 101 Ohio App.3d 48, 52, 654 N.E.2d 1333 (3d Dist.1995).

{¶22} "Complete clarity in every term of the agreement is unnecessary because all agreements have some degree of indefiniteness and uncertainty." *Advantage Renovations, Inc. v. Maui Sands Resort, Co., LLC*, 6th Dist. Erie No. E-11-040, 2012-Ohio-1866, ¶ 18, citing *Kostelnik* at ¶ 17; *Rutledge v. Hoffman*, 81 Ohio App. 85, 86, 75 N.E.2d 608 (1st Dist.1947) ("[S]eldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required."). Rather, the goal in enforcing oral contracts is to hold people to the promises they make. *Kostelnik* at ¶ 17, citing 1 Corbin, Contracts, Section 4.1, 530 (Perillo Rev.Ed.1993).

{¶23} Here, it is undisputed that Lambert received a substantial amount of money from his brother, John. John produced evidence of checks made payable to Lambert totaling $122,000, which Lambert cashed. John repeatedly testified that the monies he disbursed to Lambert were interest-free loans, not gifts, and he fully expected to be paid back. He stated that he loaned Lambert the money in good faith because Lambert asked to borrow money, he was out of work, and he needed the money. John also testified that Lambert stated that he would pay

him back in monthly installments, and John trusted his brother to do so. Upon learning that Lambert was not going to pay him back, John became distraught and cried. The evidence shows that Lambert did not repay John.

{¶24} Other family members' testimony supported John's position. Drue testified that she understood the monies were disbursed as a loan for the purchase of a home for Lambert and Margaret. Attilio testified that he had a similar conversation with John regarding loaning money to Lambert for a home. Lambert's own son, Mark, likewise testified about the existence and terms of the loan. Mark, at the request of his father, contacted John's attorney with the proposed terms of a loan for the purchase of a house for Mark, Lambert, and Margaret, advising the attorney that John "graciously offered us a loan * * * to finance a home we wish to purchase" and "my father and I discussed with my uncle borrowing $130,000.00 from [John]'s trust fund," which was to be "interest-free." John's attorney prepared a document in response to Mark's request, which Mark stated was ultimately rejected, as he and his father "reneged" on the loan.

{¶25} Lambert's own attorney, Mark Wagner, testified regarding a promissory note he drafted for the repayment of monies to John, in which Lambert was the designated borrower. Although there was testimony regarding a purported "gift letter," Lambert's attorney had no knowledge of the letter until litigation commenced. Moreover, the "gift letter" was not authenticated, John denied signing it, and Drue testified that the signature on this letter did not belong to her grandfather. Wagner admitted that, although Lambert informed him that the money was a gift from John, he learned from Lambert that the parties had engaged in prior negotiations concerning a loan repayment plan between John and Lambert.

{¶26} In light of the above, we conclude that there was competent, credible evidence from which the trial court could reasonably find that John and Lambert had an oral contract in the

amount of $122,000 that had been breached. Although the repayment terms had not been finalized at the time of Lambert's and Margaret's deaths, the evidence establishes that there was a meeting of the minds as to the essential terms of the agreement: the agreement was made between the two brothers; the principal amount of the loan had been established as $122,000, as evidenced by the checks John had disbursed to Lambert; and all parties understood the loan was to be interest-free. *See Mantia v. House*, 178 Ohio App.3d 763, 2008-Ohio-5374, 900 N.E.2d 641, ¶ 12 (2d Dist.) (in a contract that is not for goods, essential elements of a contract include identification of the parties, the amount of indebtedness, and the fact that no payments have been made on the loans).

{¶27} Moreover, although there was testimony that the money John disbursed was a gift, the factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶28} Accordingly, the trial court did not err in finding that John had a valid oral contract with Lambert that Lambert breached. Santabarbara's first assignment of error is overruled.

**Unjust Enrichment**

{¶29} In her second and third assignments of error, Santabarbara claims that the trial court erred in finding that John had a valid claim of unjust enrichment against Margaret's estate in the amount of $122,000.

{¶30} A claim for unjust enrichment arises out of a contract in law, or a quasi-contract. *CCI Props. v. McQueen*, 8th Dist. Cuyahoga No. 82044, 2003-Ohio-3674, ¶ 13, citing *Hummel v. Hummel*, 133 Ohio St. 520, 525, 14 N.E.2d 923 (1938). This type of contract is not a true contract; rather, it is an "'obligation that is created by the law without regard to expressions of assent by either words or acts,' * * * and is imposed to prevent a party from retaining money or

benefits which in justice and equity belong to another." *Legros v. Tarr*, 44 Ohio St.3d 1, 7-8, 540 N.E.2d 257 (1989), quoting 1 Corbin on Contracts (1963) 44, Section 19.

**{¶31}** Unjust enrichment occurs where "'a person has and retains money or benefits which in justice and in equity belong to another.'" *Smith v. Vaughn*, 174 Ohio App.3d 473, 2007-Ohio-7061, 882 N.E.2d 941, ¶ 10 (1st Dist.), quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, 834 N.E.2d 791, ¶ 20. The purpose of an unjust enrichment claim is to enable the plaintiff to recover the benefit he has conferred on the defendant under circumstances in which it would be unjust to allow the defendant to retain it. *Johnson* at ¶ 21, citing *Hughes v. Oberholtzer*, 162 Ohio St. 330, 335, 123 N.E.2d 393 (1954). In cases where a contract claim fails for a lack of a "meeting of the minds," courts have concluded that equity should be imposed in order to prevent unjust enrichment. *House*, 178 Ohio App.3d 763, 2008-Ohio-5374, 900 N.E.2d 641, at ¶ 13; *Myers v. Good*, 4th Dist. Ross No. 06CA2939, 2007-Ohio-5361, ¶ 12; *Hailey v. MedCorp, Inc.*, 6th Lucas No. L-05-1238, 2006-Ohio-4804, ¶ 17, 18.

**{¶32}** In order to prevail on a claim for unjust enrichment, a plaintiff must demonstrate by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances in which it would be unjust for him or her to retain that benefit. *PNC Bank, N.A. v. Bulldog Asset Recovery*, 8th Dist. Cuyahoga No. 100692, 2014-Ohio-4802, ¶ 15, citing *Johnson* at ¶ 20.

**{¶33}** Here, as discussed above, the evidence demonstrates that John loaned Lambert money in order to purchase a home. Lambert's own son, Mark, acknowledged that John offered Mark, Lambert, and Margaret an interest-free loan of $130,000 in order to finance the purchase

of a home.   The six checks disbursed to Lambert totaled $122,000, and there is evidence that the $60,000 check issued in June 2011 was used for the initial down payment on the home.

{¶34} By loaning both Lambert and Margaret money so that they could purchase a home, John conferred a benefit on Lambert as well as Margaret.

{¶35} Although the checks were made payable to Lambert and were endorsed by Lambert, Lambert and Margaret owned the home jointly.   Margaret was a listed buyer on the purchase agreement and a borrower on the loan with Home Savings and Loan.   Moreover, when Lambert died, his interest in the property passed outside of probate to Margaret.   Margaret therefore retained the benefit of the funds disbursed by John through Lambert's estate.   The evidence shows that the executor of the estates had notice of John's claim at the time of the transfer.   Neither Lambert nor Margaret made payments on the loan at any time.

{¶36} The evidence also shows that Margaret had knowledge of the benefit.   The email sent by Mark, at Lambert's request, stated that the loan in the amount of $130,000 was for the purchase of a home in which Lambert, Margaret, and Mark would live.   Mark acknowledged that both Lambert and Margaret participated in the loan discussions, stating that the loan papers should be forwarded to "my father, my mother, and I to review with our attorney."

{¶37} Finally, we find that the evidence supports the trial court's conclusion that it would be unjust under the circumstances for Margaret's estate to retain the benefit of the monies disbursed by John.   As the trial court stated, the testimony demonstrated that John intended the money as a loan, never as a gift, no payments were made to John on the loan, and the brothers were attempting to finalize the repayment terms when, tragically, Lambert and Margaret passed away.

**{¶38}** In light of the above, we find that there is competent and credible evidence to support the trial court's finding of unjust enrichment against Margaret's estate in the amount of $122,000. Santabarbara's second and third assignments of error are overruled.

**Motion for Continuance of Trial**

**{¶39}** In her fourth assignment of error, Santabarbara claims that the trial court abused its discretion when it denied her motion for a continuance of trial. She alleges that she was deprived the opportunity to fully develop discovery, including obtaining the plaintiff's deposition.

**{¶40}** The decision to grant or deny a motion for a continuance of trial lies within the sound discretion of the trial court. *Kinas v. Kinas*, 8th Dist. Cuyahoga No. 98965, 2013-Ohio-3237, ¶ 28, citing *State v. Lorraine*, 66 Ohio St.3d 414, 423, 613 N.E.2d 212 (1993); *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981). We will therefore not reverse the trial court's decision absent an abuse of discretion. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶41}** When determining whether a trial court abused its discretion in denying a motion for a continuance, the reviewing court should consider the following factors: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to witnesses, opposing counsel, and the court; (4) whether there is a legitimate reason for the continuance; (5) whether the defendant contributed to the circumstances giving rise to the need for the continuance; and (6) other relevant factors, depending on the unique facts of each case. *Rawlin Gravens Co., L.P.A. v. Jatsek Constr. Co.*, 8th Dist. Cuyahoga No. 100587, 2014-Ohio-1952, ¶ 22, citing *Unger* at 67-68.

{¶42} The complaints in this matter were filed against Santabarbara as executor of both Lambert's and Margaret's estates on December 3, 2012. The court consolidated the cases on December 31, 2012, and following a case management conference, scheduled the matter for trial on September 19, 2013. It appears that on the day before trial, defense counsel moved for a continuance of the trial in order to obtain John's deposition. The court granted the motion and continued the trial for one day. On that day, defense counsel deposed John. When the trial commenced the following day, counsel renewed his motion for a continuance of the trial, stating that, as a result of the deposition, counsel had obtained new information and would need more time in which to obtain documentation of this information. Counsel further stated that he would need more time in which to obtain a transcript of John's deposition in order to cross-examine John on the stand. Finally, he advised the court that one of his witnesses, attorney Mark Wagner, would not be available to testify until Monday due to his schedule.

{¶43} Plaintiff's counsel objected to any further continuances. She reminded the court of the previous continuance of one day and advised the court that defense counsel missed many opportunities to depose her client in the previous months, stating that she repeatedly made her client available to defense counsel. She further noted that the matter had been scheduled for trial for "a long time" and she questioned why the court and counsel were only now notified of Wagner's inability to appear as a witness at the commencement of the trial.

{¶44} After hearing from both defense counsel and plaintiff's counsel, the court denied Santabarbara's motion and proceeded to trial. The court stated that the matter had been pending since last December, giving the defendant eight months to depose the plaintiff and obtain a transcript, the trial was continued one day for the benefit of the defendant, and the trial would likely continue through Monday, which would allow Wagner to testify then. The court

ultimately determined that eight months provided defense counsel "plenty of opportunit[ies] to depose [his] witnesses."

{¶45} In light of the above, we find the trial court did not abuse its discretion in denying the defendant's motion for a continuance of trial. Santabarbara's fourth assignment of error is overruled.

## The Judgment

{¶46} Without any support for her assertion, Santabarbara claims that the trial court erred, abused its discretion, and "clearly lost [its] way" when it entered judgment "against defendant," arguing that the court failed to determine "which defendant the judgment is against, or if any of the judgment is against both defendants." This argument has no merit. The trial court found the plaintiff-appellee's claims against the estates of Lambert and Margaret in the amount of $122,000 to be valid and entered judgment "for plaintiff and against defendant in the amount of $122,000." The sole defendant in this case is Kathleen Santabarbara, as the executor of the estates of Lambert and Margaret, and there is one award of $122,000. Accordingly, we find no error in the judgment. Santabarbara's fifth assignment of error is overruled.

## Theories of Recovery

{¶47} Lastly, Santabarbara claims that the trial court erred in sustaining multiple claims against the estates of Lambert and Margaret. We find no merit to this argument.

{¶48} Here, John filed claims against both estates. He alleged that Lambert breached an oral contract with John and Margaret and was unjustly enriched by the funds John loaned Lambert. Although he essentially presented alternative theories upon which to recover from each estate, John presented a single claim of relief. In its judgment, the trial court determined that John could recover under either theory, and it awarded a single recovery of damages "for

plaintiff and against defendant in the amount of $122,000." Because the trial court sustained John's claim under different theories of recovery, against the two different estates, but permitted only a single recovery, we find no error in the trial court's judgment in this regard. *See Brenner Marine, Inc. v. George J. Goudreau, Jr. Trust*, 6th Dist. Lucas No. L-93-077, 1995 Ohio App. LEXIS 62 (Jan. 13, 1995) (plaintiff is entitled to only single recovery of damages even though such plaintiff may be entitled to plead alternative theories of recovery); *Homes v. Sullivan*, 5th Dist. Holmes No. 95-CA-541, 1997 Ohio App. LEXIS 5884, *8 (Dec. 18, 1997) (to permit a double recovery on mutually exclusive theories of recovery would be plain error ).

{¶49} Santabarbara's sixth and seventh assignments of error are overruled.

{¶50} The judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

LARRY A. JONES, SR., P.J., and
SEAN C. GALLAGHER, J., CONCUR