[Cite as *Underwood v. Boeppler*, 2015-Ohio-156.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| RAYMOND UNDERWOOD, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2014-02-055 |
| | : | O P I N I O N |
| - vs - | | 1/20/2015 |
| | : | |
| ERIC BOEPPLER, et al., | : | |
| Defendants-Appellants. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2912-06-2204

Katzman Logan Halper & Bennett, Kenneth B. Flacks, 9000 Plainfield Road, Cincinnati, Ohio 45236 and Walter I. Rubin, 3194 Dot Drive, Cincinnati, Ohio 45213-1008, for plaintiff-appellee

Brandabur & Bowling Co., L.P.A., Michael J. Brandabur, 315 South Monument Street, Hamilton, Ohio 45011, for defendants-appellants

**RINGLAND, P.J.**

{¶ 1} Defendants-appellants, Eric Boeppler, The Eric Boeppler Family Partnership, The Eric Boeppler Family Limited Partnership, A Savannah Nite Limousine Service, and The Eric & Lynn Boeppler Family Limited Partnership (collectively Boeppler), appeal a jury verdict rendered in the Butler County Court of Common Pleas in favor of plaintiff-appellee, Raymond

Underwood, on a breach of contract claim.[1]

{¶ 2} This case arises out of the sale of a 2007 Dodge Charger Limousine (Charger Limo). Boeppler operates a limousine service, A Savannah Nite Limousine Service. Eric Boeppler initially met Underwood in 2007 when Underwood was a customer of A Savannah Nite. Underwood also later became a part-time driver for Boeppler. In early 2010, Boeppler and Underwood began discussing the possible purchase of a limousine. Around July 8, 2010, Underwood and Boeppler entered into a written agreement, wherein Underwood purchased the Charger Limo from Boeppler for a purchase price of $51,000. The Agreement stated in part:

> There will be a $30,000.00 deposit paid to The Eric Boeppler Family Limited Partnership by Raymond Underwood. The remaining balance of $21,000.00 will be paid over time. In which we will keep the limousine in our possession and the title in our possession. Once the limousine is paid off there will be a 30% and 70% split. The 30% will go to The Eric Boeppler Family Limited Parnership and the 70% will go to Raymond Underwood. Raymond Underwood will have to have a regular automobile insurance policy on the limousine. The Eric Boeppler Family Limited Partnership will keep the livery insurance policy on the limousine and the cost of that policy will be the responsibility of Raymond Underwood. The vehicle is a 2007 Dodge Charger Limousine, color is orange, mileage is 24,000, purchase price is $51,000.00. [sic]

{¶ 3} On June 13, 2012, Underwood filed a complaint against Boeppler asserting several claims related to the sale of the Charger Limo, including (1) breach of contract, (2) fraud, (3) conversion, (4) request for accounting, (5) civil conspiracy, and (6) recession of the contract. Boeppler filed an answer, as well as a counterclaim asserting one claim for breach of contract against Underwood. The case proceeded to a jury trial wherein the parties each claimed the other breached the contract relating to the Charger Limo.

{¶ 4} At trial, the parties agreed on several facts: (1) the purchase price was $51,000;

---

1. For ease of discussion, we will refer to appellants collectively as Boeppler, and where necessary, will refer to appellant, Eric Boeppler, by name.

(2) of that $51,000, Underwood had paid $41,215; and (3) the written agreement did not contain all terms agreed upon by the parties. Both Eric Boeppler and Underwood testified that the contract included several oral terms which were not found in the written agreement. However, the parties' view of these oral provisions differed significantly. Specifically, the following two provisions were at issue: (1) how, if at all, revenue would be split while Underwood was paying the balance of the purchase price; and (2) the payment of livery insurance for the Charger Limo.[2]

{¶ 5} Essentially, Underwood asserted the parties intended to split revenue for the Charger Limo 70/30 while he was still making payments on the vehicle. According to Underwood, 70 percent of the revenue belonged to Underwood and was to be applied towards the purchase price of the Charger Limo and 30 percent of the revenue belonged to Boeppler and was to cover the maintenance and livery insurance costs. Underwood therefore argued Boeppler breached the terms of the contract by not applying any of the receipts from the rental of the Charger Limo, pursuant to the agreed 70/30 split. Eric Boeppler, however, testified it was agreed that Boeppler would receive 100 percent of the revenue, with no credit being applied to Underwood until the vehicle was paid in full. Boeppler also presented testimony that the parties agreed Underwood would pay a flat rate of $4,600 annually for the livery insurance, regardless of its actual cost. Although Boeppler stipulated that Underwood had paid $41,215 of the purchase price, Boeppler contended Underwood breached the contract as he had failed to pay the remaining balance of the purchase price or pay for the cost of maintenance and livery insurance for the vehicle.

{¶ 6} After hearing all the evidence, the jury found in favor of Underwood on his breach of contract claim and against Boeppler on Boeppler's counterclaim. Underwood was

2. At trial, it was testified that livery insurance is a type of insurance required for companies which offer transportation services for hire.

awarded $41,215 in damages. Boeppler filed this timely appeal, raising one assignment of error for review:

{¶ 7} THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THEY FAILED TO FOLLOW THE INSTRUCTIONS.

{¶ 8} In their sole assignment of error, Boeppler asserts that the jury's decision in favor of Underwood on his breach of contract claim and on Boeppler's counterclaim was against the manifest weight of the evidence because the evidence presented at trial demonstrated that Underwood breached the parties' contract by failing to pay the full purchase price and by failing to pay the livery insurance on the Charger Limo. Boeppler claims that the written contract is clear that the 70/30 split began after the Charger Limo was paid in full. In addition, Boeppler asserts the contract is similarly clear that Underwood was responsible for the cost of livery insurance. Boeppler claims that because the contract was clear regarding these two terms, Underwood's testimony attempting to vary these express terms violated the parol evidence rule. We find no merit to these arguments.

{¶ 9} As an initial matter, we must first address Boeppler's contention that the trial court erred and violated the parol evidence rule in admitting extrinsic evidence to explain the terms of the parties' contract. The parol evidence rule is a rule of substantive law that prohibits parties to a contract from later contradicting the express terms of the contract with evidence of other alleged or actual agreements. *Turner v. Langenbrunner*, 12th Dist. Warren No. CA2003-10-099, 2004-Ohio-2814, ¶ 21. It provides that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *D & H Autobath, LLC. v. PJCS Properties I, Inc.*, 12th Dist. Fayette No. CA2012-05-018, 2012-Ohio-5845, ¶ 17.

{¶ 10} The parol evidence rule only bars the admission of evidence of an oral

- 4 -

agreement when there is a final written integration of the parties' agreement. *Nguyen v. Chen*, 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, ¶ 41, citing *Galmish v. Cicchini*, 90 Ohio St.3d 22, 28, (2000) ("[t]he parol evidence rule applies * * * only to integrated writings"). Integration is the act of embodying the complete terms of an agreement in a writing. *Galmish* at 27. However, if the integration is only a "partial integration," then the writing does not fully express the parties' intent. *Williams v. Spitzer Autoworld Canton, L.L.C.* 122 Ohio St.3d 546, 554, 2009-Ohio-3554, ¶ 28 (Cupp, J., concurring); *Russell v. Daniels–Head & Assocs., Inc.* 4th Dist. Scioto No. 1600, 1987 WL 13943, *4 (June 30, 1987). "The rule of partial integration is a well-established exception to the parol evidence rule and is invoked where the entire agreement has not been reduced to writing. Where a contract is partly written and partly oral, parol evidence is admissible to prove the oral terms." *Hunter v. Conner*, 12th Dist. Warren No. 443, 1981 WL 5223, *2 (Oct. 21, 1981).

{¶ 11} In the present case, both Boeppler and Underwood presented testimony that the written agreement did not include all of the terms agreed to by the parties. It is clear that both parties resorted to the presentation of extrinsic evidence in effort to explain the contract. Both parties testified regarding provisions which were not included in the written agreement but were allegedly agreed to verbally and such testimony did not contradict what was in the written agreement. This contract presents the scenario where the contract is partly written and partly oral. Accordingly, as the agreement did not embody the complete terms agreed to by the parties, the parol evidence rule did not preclude extrinsic evidence to prove the oral terms, and the trial court did not err in admitting such evidence. In this case, it was proper and necessary to admit evidence regarding the oral terms of the parties' contract in order to reach the merits of the parties' respective claims. We further note that Boeppler did not object to the extrinsic evidence offered by Underwood at trial as improper parol evidence. Rather, Boeppler participated in eliciting such testimony from Underwood and Eric Boeppler

himself testified regarding terms of the contract which he claimed were agreed to orally. On this record, we find no violation of the parol evidence rule. We therefore turn to whether the judgment is supported by the weight of the evidence.

{¶ 12} When evaluating whether a judgment is against the manifest weight of the evidence in a civil case, the standard of review is the same as in the criminal context. *Aztec Internatl. Foods, Inc. v. Duenas*, 12th Dist. Clermont No. CA2012-01-002, 2013-Ohio-450, ¶ 35, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. "[W]e weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Marinich v. Lumpkin*, 12th Dist. Warren No. CA2011-11-124, 2012-Ohio-4526, ¶ 20, quoting *Eastley* at ¶ 20. In weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Eastley* at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Roberts v. Mike's Trucking, Ltd.*, 12th Dist. Madison Nos. CA2013-04-011 and CA2013-04-014, 2014-Ohio-766, ¶ 57, quoting *Seasons Coal Co.* at 81. A court of appeals panel must act unanimously to reverse a jury verdict on the weight of the evidence. *Purcell v. Schaefer*, 12th Dist. Preble No. CA2013-09-007, 2014-Ohio-4894, ¶ 8, citing *Eastley* at ¶ 7.

{¶ 13} In order to establish a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) plaintiff fulfilled its contractual obligations, (3) defendant failed to

fulfill its contractual obligations, and (4) plaintiff incurred damages as a result. *Chen*, 2014-Ohio-5188 at ¶ 43. In the instant case, Boeppler contends Underwood was not entitled to judgment in his favor as the weight of the evidence demonstrated that Underwood did not fulfill his contractual obligations and therefore breached the parties' agreement. Specifically, Boeppler asserts Underwood breached two separate provisions of the contract: (1) failing to pay the full $51,000 purchase price; and (2) failing to pay the cost of the livery insurance. Boeppler further argues that the jury failed to follow the jury instructions in reaching its verdict as the instructions "required as a condition precedent for finding in favor of Underwood, that they find Underwood was not in breach of contract," and the evidence presented at trial demonstrated Underwood had, in fact, breached the contract.

{¶ 14} In arguing that the evidence demonstrated Underwood failed to pay the full $51,000 purchase price, Boeppler asserts that the parties' written agreement clearly states: "Once the limousine is paid off there will be a 30% and 70% split." Boeppler asserts that this provision of the written agreement prevented splitting revenue until the Charger Limo was paid off. Moreover, Boeppler contends that even if the jury found the parties intended revenue to be split 70/30 at the outset of the relationship, the evidence demonstrated Underwood still failed to pay the full purchase price.

{¶ 15} Based on our review of the record, we find there is competent, credible evidence to support the jury's finding that Underwood did not breach the contract and we find the jury's determination that Underwood paid the $51,000 purchase price is not against the manifest weight of the evidence. As an initial matter, we note that the written agreement only mentions the manner in which revenue would be split once the Charger Limo was paid off. The Agreement is silent with regard to how revenue would be split prior to the Charger Limo being paid in full. Accordingly, we find no merit to Boeppler's assertion that the written agreement dictated a result in its favor.

{¶ 16} At trial, Underwood testified the parties agreed that revenue generated by the Charger Limo would be split 70 percent to him and 30 percent to Boeppler, both while he was making payments on the vehicle and once the vehicle was paid off. Underwood explained how the parties agreed on this arrangement. Underwood testified that initially the parties agreed he would make a cash down-payment of $25,000 and obtain financing from his bank for the remaining $26,000 of the purchase price. Upon payment of the $51,000, Underwood would own the vehicle outright, title would be placed in his name, and he would carry the insurance. Underwood testified the parties initially agreed that Boeppler would rent out the Charger Limo as part of Boeppler's fleet, revenue would be split 75 percent to Underwood and 25 percent to Boeppler, and Boeppler would perform all maintenance. However, Underwood was unable to obtain financing through his bank. Underwood testified that Eric Boeppler then agreed to sell the Charger Limo if Underwood would increase the down-payment to $30,000, and increase the revenue split from 75 percent and 25 percent to 70 percent and 30 percent. According to Underwood, Eric Boeppler explained he would agree to the 5 percent change in order to pay for insurance and maintenance on the Charger Limo. Underwood testified he agreed to this arrangement and believed that all the revenue generated by the Charger Limo would go to Boeppler and Boeppler would then apply 70 percent of the funds to the balance of the purchase price and 30 percent of funds would be applied to the cost of maintenance and insurance. Finally, Underwood testified that once the Charger Limo was paid in full, it was his understanding that he would assume the cost of any insurance or maintenance, and revenue would continue to be split 70 percent to Underwood and 30 percent to Boeppler.

{¶ 17} Eric Boeppler, on the other hand, testified revenue was not to be split until *after* Underwood paid off the Charger Limo. According to Eric Boeppler, Boeppler was entitled to 100 percent of the revenue generated by the Charger Limo until Underwood paid the full

purchase price, and only once it was paid off would the revenue be split 70 percent to Underwood and 30 percent to Boeppler. The only deviation to this split was if Underwood personally obtained a booking on the Charger Limo rather than it being booked by A Savannah Nite. According to Boeppler, in that situation, Underwood was entitled to 100 percent of the revenue.

{¶ 18} After reviewing the evidence presented at trial, we find there is substantial evidence to support the jury's finding that the parties intended to split the revenue from the outset of the contract. Although Boeppler claimed there was to be no revenue split until the vehicle was paid in full, the conduct by both parties established otherwise. At the outset of the contract, Boeppler forwarded copies of the call sheets and contracts related to the Charger Limo. From this information, Underwood was able to calculate what he believed should be credited to his balance owed on the Charger Limo. Underwood then sent Boeppler his own reconciliation of the account based on these documents. However, this practice only lasted a few months. Eric Boeppler admitted that he later quit sending copies of the call sheets and contracts to Underwood due to the fact that personal customer information was included on these documents. Underwood entered into evidence a text message exchange between himself and Eric Boeppler in March 2012 wherein Underwood requested to see call sheets and contracts for the Charger Limo for 2011 and 2012. However, the two never met and the information was not provided to Underwood. Finally, and most significantly, Underwood testified that on August 27, 2011, Eric Boeppler informed him the Charger Limo was "paid in full." From this evidence, we find the jury could have reasonably concluded that the parties agreed to a revenue split even before the vehicle was paid off and that based on the split in revenue, the Charger Limo had been paid for as of August 27, 2011.

{¶ 19} Boeppler contends that even if the jury found the parties intended revenue to

be split 70/30 at the outset of the relationship, the evidence presented at trial still demonstrated Underwood failed to pay the full purchase price. Boeppler places great emphasis on the fact that it presented uncontroverted testimony and evidence that the revenue generated by the Charger Limo for 2010 through 2012 totaled $8,301.85. Boeppler therefore argues that even if 70 percent is applied to this figure and then added to Underwood's previous payments of $41,215, the total payments made by Underwood would be $49,516.85, leaving him with a deficiency of $1,483.15 on the $51,000 purchase price.[3] However, the mere fact that testimony is uncontroverted does not necessarily require the jury to accept the evidence. *Cropper v. Jewell*, 12th Dist. Clermont No. CA2008-09-088, 2009-Ohio-3683, ¶ 9. Rather, the jury is free to believe, all, part, or none of the testimony of the witnesses which appeared before it. *Roberts v. Mike's Trucking, Ltd.*, 12th Dist. Madison Nos. CA2013-04-011 and CA2013-04-014, 2014-Ohio-766, ¶ 75.

**{¶ 20}** In addition, Underwood presented testimony at trial that indicated the Charger Limo went on several more runs than reflected in Boeppler's revenue sheets. Eric Boeppler stated he no longer had the original call sheets and contracts as the company's policy was to destroy such documents every 30, 60 or 90 days. Accordingly, the only evidence of the revenue generated by the Charger Limo during 2010 through 2012 was Boeppler's own summary records. Moreover, as mentioned previously, Underwood testified that Boeppler told him on August 27, 2011, that the Charger Limo was paid in full. In light of the foregoing, the jury's finding that Underwood paid the full $51,000 purchase price is not against the manifest weight of the evidence. It is clear that the jury found Underwood's version of the events more credible than Eric Boeppler's version of the events. The jury in this case was in

---

3. At trial, the parties agreed that the revenue split was to be applied to the base rate of the rental of the Charger Limo. The base rate was determined by taking the total cost charged to the customer and deducting tax, fuel, and the driver's gratuity.

a better position to view the witnesses, observe their demeanor, and assess their credibility.

**{¶ 21}** Boeppler also argues on appeal that the jury's verdict was against the manifest weight of the evidence because the evidence at trial demonstrated Underwood breached the parties' contract by failing to pay the cost of livery insurance. Again, Boeppler asserts the language of the written agreement is clear and Underwood was responsible for the cost of livery insurance. Boeppler is correct that the agreement states that Underwood is responsible for the cost of livery insurance and Underwood does not dispute that he was responsible for this expense. The parties do dispute, however, the manner in which the livery insurance was to be paid and the actual cost of this insurance.

**{¶ 22}** At trial, Eric Boeppler testified that the parties orally agreed Underwood would pay $4,600 annually for livery insurance. Eric Boeppler further testified Underwood never made a payment on this insurance in 2010, 2011, or 2012. Eric Boeppler stated he informed Underwood by letter in December 2011, and by text message in March 2012, that Underwood owed Boeppler the cost of insurance for the last "two years." Underwood, however, testified the cost of the livery insurance for the Charger Limo was to be covered by the revenue split. According to Underwood, the 5 percent change from 25 percent to 30 percent in the revenue split was to cover the cost of the livery insurance. On appeal, Boeppler asserts that the 5 percent change would "come no where [sic] near covering insurance and maintenance" on the vehicle.

**{¶ 23}** In the present case, although there was competing evidence presented, the jury believed Underwood's testimony that the parties had contracted and agreed that the cost of livery insurance would be paid by way of splitting the revenue generated by the Charger Limo. We find no indication in the record that the jury clearly lost its way and created a manifest miscarriage of justice in finding Underwood paid the cost of livery insurance in this manner. It is clear that the jury found Underwood's version of the event's more credible than

that proffered by Boeppler. Credibility is primarily a matter for the trier of fact as the trier of fact is in a better position to judge the credibility of the witness and give weight to the evidence. This court will not reverse a jury decision simply due to contrary evidence. *See Roberts*, 2014-Ohio-766 at ¶ 75.

{¶ 24} Based on the record in this case, and after weighing the inferences and examining the credibility of the witnesses, we cannot find that the jury clearly lost its way so as to create a manifest miscarriage of justice requiring the verdict to be reversed. In addition, as the jury's verdict finding Underwood was not in breach of the parties' contract is supported by the weight of the evidence, we cannot find the jury failed to follow the instructions given in this case. Accordingly, appellants' sole assignment of error is overruled.

{¶ 25} Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.