[Cite as *Smith-Knabb v. Vesper*, 2023-Ohio-259.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| SUSAN SMITH-KNABB, | : | |
| Appellant, | : | CASE NO. CA2022-06-044 |
| | : | O P I N I O N |
| - vs - | | 1/30/2023 |
| | : | |
| JEREMY VESPER, et al., | : | |
| Appellee. | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20-CV-093357

Rebold Larkin Murray, LLC, and Kyle D. Murray, for appellant.

Ruppert Law, and Ronald W. Ruppert, for appellee.

**PIPER, P.J.**

{¶1}   Appellant, Susan Smith-Knabb, appeals from the decision of the Warren County Court of Common Pleas overruling her objections and adopting a magistrate's decision.  Susan brought this complaint against her daughter, Wendy Smith, and former son-in-law, Jeremy Vesper, asserting claims for declaratory judgment, breach of contract, promissory estoppel, and unjust enrichment.

{¶2}   This case involves a dispute regarding an alleged oral contractual agreement

between the parties for the purchase and repayment of money for a home. The record shows that Wendy and Jeremy, who at the time were boyfriend and girlfriend, were residing with their child in one of Susan's rental properties in North College Hill.

{¶3} Susan testified that in June 2004 she purchased a home located at 5994 Turning Leaf Way, Maineville, Ohio ("Turning Leaf") for Wendy and Jeremy to raise their family. Susan stated that she wanted to help Wendy and Jeremy purchase a home, in part because Wendy was her only child who did not attend college. However, because she could not afford to purchase a home for all of her children, Susan testified that Wendy and Jeremy would need to repay her for the purchase price of the house in the form of an interest free loan. She stated the terms of the agreement were:

> A. The terms were monthly payments of the full amount, divided by 30 years, which would be 360 months. And if I were to predecease, the terms of that verbal agreement, they would make sure that the money went into my trust.
>
> Q. Okay. Do you remember what the purchase price for Turning Leaf was?
>
> A. It was 182,900, in that vicinity.
>
> Q. Okay. And, then, again, if you'll be clear, the purchase price was 182,900. How did you calculate the monthly payments or who calculated the monthly payments?
>
> A. They originally began paying $500 a month. And Jeremy became a loan officer with Fifth Third Bank and informed me it would be $508 a month and that would be the full amount over a 30-year period.

{¶4} The deed for the Turning Leaf home did not list Jeremy. The general warranty deed conveyed the Turning Leaf home to Wendy and Susan. Nevertheless, both Susan and Wendy maintained that the $182,880 used to purchase the Turning Leaf home was an interest free loan that Wendy and Jeremy were to repay Susan. Susan admits that she did not create any written contract or promissory note for the repayment of money.

{¶5} Susan testified that Wendy and Jeremy began making payments on January 1, 2005. Susan stated that she kept track of the payments with notations she made on her calendars, some of which she was able to reproduce, and others she was not. With the exception of three payments that were purportedly not made, Susan states that Wendy and Jeremy made continuous payments of $508 monthly continuing for the time they resided at the Turning Leaf home.

{¶6} Wendy and Jeremy were married in January of 2006. Throughout the years, Wendy and Jeremy had three more children and decided they needed to move into a larger home. They later found a suitable home at 1130 Cheltenham Place, Maineville, Ohio ("Cheltenham"). The record shows that Wendy and Jeremy had not yet sold their home on Turning Leaf before purchasing the Cheltenham home. Since the Turning Leaf home had not sold, Susan testified that she and her husband secured a "bridge loan" of nearly $100,000 to allow Wendy and Jeremy to purchase the Cheltenham home. As Susan understood it, this "bridge loan" was to be repaid upon the sale of the Turning Leaf home. Thereafter, Susan said she would continue to receive the $508 monthly payment from Wendy and Jeremy based upon their oral agreement for the purchase of the Turning Leaf home—even after it sold to a new owner.

{¶7} On cross-examination, Jeremy introduced a gift letter electronically signed by Susan stating that the $100,000 was a gift.[1] The letter states:

> I/We (Donor) have made a gift of $100,000 dollars to the Borrower(s) named below, and no repayment of this gift is expected or implied either in the form of cash or future services of the recipient.
>
> This gift is to be applied toward the purchase of the property

---

1. A cashier's check in the amount of $96,273.56 was entered as an exhibit showing the down payment made on the Cheltenham home. There is no indication from the parties that there is a distinction between the generally alleged "$100,000" and the more precise "$96,274.56," and therefore we conclude this is a de minimis discrepancy.

located at 1130 Cheltenham Pl, Maineville, OH 45039.

{¶8} On May 13, 2016, Jeremy purchased the Cheltenham home for $340,000 in his name alone. Jeremy testified that the decision to list him alone on the property was due to Wendy's debt to income ratio, which may have prevented the sale. The Cheltenham home was secured by a mortgage and promissory note for $246,000 listing Jeremy as the borrower and Polaris Home Funding Corp. as the lender. In addition, the record shows that Jeremy made a down payment of $96,273.56.

{¶9} The Turning Leaf home was sold several months later on December 16, 2016. According to the closing statement, the Turning Leaf home sold for $199,000. Deductions were taken from that sum for prorations/adjustments, charges and escrow, commission payments, and other charges. Additionally, the closing statement indicates that $47,549.81 was used to payoff a first mortgage on the property held by Fifth Third Bank. While not discussed at length, there was testimony that the money from this loan was used to finish the basement. Since Wendy could not secure a loan in her name, Wendy testified that Jeremy took out this loan with Susan serving as a cosigner. After calculating the debits and credits, Wendy and Susan received $130,551.48. Susan asserted that she kept $100,000 of these proceeds to pay off her "bridge loan." The remaining proceeds from the sale went to Wendy who testified that she used the money to purchase new furniture.

{¶10} Susan explained that Wendy and Jeremy continued to make monthly payments of $508 dollars to her even after the sale of the Turning Leaf home. Susan testified that they made all their payments in 2017 and 2018. In October 2018, Jeremy filed for divorce from Wendy. In an affidavit, Jeremy disclosed an outstanding debt, which he listed as "Susan Smith Balance" in the amount of $90,000 with a monthly payment of $508. The affidavit does not elaborate on the source of the loan, nor does it state that the "Balance" is related to the purchase of the Turning Leaf home, or any other real property.

{¶11} Susan argued that Wendy and Jeremy stopped making payments in July 2019. Susan submits, however, that Wendy made an additional payment of $20,000. Further, Susan indicated that Wendy resumed making payments in the amount of $500 every month since September 2020.

{¶12} Wendy and Jeremy were granted a final judgment and decree of divorce on July 13, 2020. Pursuant to the terms of the final judgment and decree, Jeremy paid Wendy $55,000 for her interest in the Cheltenham home.

{¶13} On June 2, 2020, Susan filed a complaint for declaratory judgment, breach of contract, promissory estoppel, and unjust enrichment against Wendy and Jeremy. The case was tried to a magistrate on September 20, 2021. The magistrate found that the parties' agreement violated the statute of frauds. Furthermore, the magistrate found that the "bridge loan" was a gift based upon the clear and unambiguous language contained in the gift letter that Susan electronically signed. Finally, the magistrate concluded that Susan's claims for promissory estoppel and unjust enrichment also failed. Susan filed timely objections, which the trial court overruled. The trial court specifically stated that there was no testimony as to specific terms and "the evidence was void of any evidence to prove this was a contract." The trial court also concurred with the magistrate's decision that the parties' oral contract violated the statute of frauds. Furthermore, the trial court found that the "bridge loan" was a gift and denied Susan's claims for promissory estoppel and unjust enrichment. Susan now appeals, raising a single assignment of error for review:

{¶14} THE TRIAL COURT ERRED WHEN IT RULED THAT THE BRIDGE LOAN GIVEN BY PLAINTIFF TO DEFENDANTS WAS A GIFT BECAUSE IT FAILED TO ESTABLISH THE ELEMENTS OF A GIFT.

{¶15} In her sole assignment of error, Susan argues the trial court's decision was against the manifest weight of the evidence when it concluded that the purported "bridge

loan" was a gift. Susan argues that the elements establishing a gift were not met in this case. While Susan does not address the substance of her breach of contract claim in her assignment of error, she discusses the terms of the agreements, as she understands them, in her statement of facts. Because she disagrees with the trial court's conclusion that the "bridge loan" was a gift, ostensibly Susan maintains that she is entitled to more money from Wendy and Jeremy under one of her claimed theories of recovery, those being: (1) declaratory judgment, (2) breach of contract, (3) promissory estoppel, and (4) unjust enrichment.[2]

{¶16} "The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Dunn v. Clark*, 12th Dist. Warren No. CA2015-06-055, 2016-Ohio-641, ¶ 8. In considering a manifest weight challenge, "the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Schneble v. Stark*, 12th Dist. Warren Nos. CA2011-06-063 and CA2011-06-064, 2012-Ohio-3130, ¶ 67. A judgment will not be reversed as being against the manifest weight of the evidence where the "judgment is supported by some competent, credible evidence going to all essential elements of the case." *Ashburn v. Roth*, 12th Dist. Butler Nos. CA2006-03-054 and CA2006-03-070, 2007-Ohio-2995, ¶ 26. In making this determination, an appellate court generally defers to the trier of fact on issues of credibility. *Frisby v. Solberg*, 12th Dist. Butler No. CA2015-11-204, 2016-Ohio-7644, ¶ 8.

---

2. Susan's claim for declaratory judgment is based upon a breach of contract theory to assert that she is entitled to an equitable lien on the Cheltenham home. This court will not separately analyze that argument as to her claim for a declaratory judgment because ultimately her cause of action premised upon a breach of contract is found to be without merit.

{¶17} In order to establish a breach of contract claim, a plaintiff must prove (1) the existence of a contract, (2) plaintiff fulfilled its contractual obligations, (3) defendant failed to fulfill its contractual obligations, and (4) plaintiff incurred damages as a result. *Underwood v. Boeppler*, 12th Dist. Butler No. CA2014-02-055, 2015-Ohio-156, ¶ 13. The essential elements of a contract include an offer, acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and consideration. *Artisan Mechanical, Inc. v. Beiser*, 12th Dist. Butler No. CA2010-02-039, 2010-Ohio-5427, ¶ 26. "Mutual assent or 'a meeting of the minds' means that both parties have reached an agreement on the contract's essential terms." *Nguyen v. Chen*, 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, ¶ 43, quoting *Beiser* at ¶ 27. The essential terms of a contract include the identity of the parties to be bound, the subject matter of the contract, the consideration to be exchanged, and the price to be paid. *Turner v. Langenbrunner*, 12th Dist. Warren No. CA2003-10-099, 2004-Ohio-2814, ¶ 13.

{¶18} An oral contract may be enforceable when the terms of the agreement are sufficiently particular. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 15. "Terms of an oral contract may be determined from the parties' words, deeds, and acts, as well as their silence." *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 26. However, seldom, if ever, does the evidence establishing an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. *Depompei v. Santabarbara*, 8th Dist. Cuyahoga No. 101163, 2015-Ohio-18, ¶ 22. Rather, the goal in enforcing oral contracts is to hold people to the promises they make. *Id.*

{¶19} Susan also brought claims for promissory estoppel and unjust enrichment. Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises. *Ringhand v. Chaney,* 12th Dist. Clermont Nos. CA2013-09-072 and CA2013-09-076, 2014-

Ohio-3661, ¶ 20.  In order to establish a claim for promissory estoppel, a party must establish the following elements: "(1) a clear and unambiguous promise was made; (2) upon which it would be reasonable and foreseeable for the party to rely; (3) actual reliance on the promise; and (4) the party was injured as a result of the reliance."  *Id.*  An unjust enrichment claim "states that a person should not be allowed to profit or enrich himself inequitably at another's expense and should be required to make restitution to the party suffering the loss."  *RG Long & Assocs., Inc. v. Kiley*, 12th Dist. Warren No. CA2014-10-129, 2015-Ohio-2467, ¶ 14.  "The party asserting a claim of unjust enrichment must demonstrate that (1) he [or she] conferred a benefit upon a defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment."  *Id.*

{¶20}  In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, "evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)."  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17.  "Preponderance of the evidence simply means 'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.'"  *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* (6th Ed.1998) 1182.

{¶21}  Although faced with conflicting testimony, the record nevertheless contains competent and credible evidence to support the trial court's ruling in favor of Wendy and Jeremy.  The record in this case shows that the parties have combined or blended the terms of several agreements or understandings resulting in terms that are difficult to ascertain.  There is no dispute that Susan used her money to purchase the Turning Leaf home.  There is also no dispute that the Turning Leaf home was purchased for $182,880.  Susan and Wendy submit that the purchase price was to be repaid monthly over a 30-year period.

Susan admits that she did not create any written contract or promissory note for the repayment. There is evidence that Wendy and Jeremy began paying $500 a month in January 2005, approximately five months after the purchase of the home. The record shows that Jeremy later modified the amount to $508. From there, any terms become more difficult to ascertain.

{¶22} For example, there are no terms with regard to the consequences of a breach in the terms of the agreement. There are also basic uncertainties regarding the parties' interests in the Turning Leaf home. As previously noted, the general warranty deed conveyed the Turning Leaf home to Wendy and Susan; Jeremy was not listed on the deed. It is unclear if Susan anticipated possessing an encumbrance on the Turning Leaf home, but her complaint alleged that she is entitled to an equitable lien on the Cheltenham home by virtue of the outstanding money she is purportedly owed by Wendy and Jeremy.

{¶23} Similarly unclear is whether Jeremy was a party to the original agreement with respect to the Turning Leaf home. Jeremy testified that the Turning Leaf home was not purchased on his behalf and the loan was not his obligation. Jeremy notes that he and Wendy were not married at the time Susan purchased the Turning Leaf home. While Jeremy admitted to administering the $508 monthly payments to Susan, he also testified that he was in charge of the family's finances and made the payments on Wendy's behalf. Jeremy further noted that his name was not on the deed and argued that he did not own the Turning Leaf home.

{¶24} Further uncertainties are evident based upon the sale of the Turning Leaf home and what the parties separately refer to as the "gift" or "bridge loan." First, there is no mention in the original agreement as to what should occur in the event the Turning Leaf home sold. Both Susan and Wendy testified that the $508 monthly payments for the Turning Leaf home were to continue in addition to the new mortgage payments that Wendy

and Jeremy were to assume on the Cheltenham home.

{¶25} Instead of selling the Turning Leaf home and applying the proceeds to the balance of her loan, Susan testified she took out a $100,000 "bridge loan" that was to be repaid upon the sale of the Turning Leaf home. Yet, on cross-examination Susan was confronted with a gift letter with an electronic signature stating that she had provided Jeremy with a $100,000 gift and that "no repayment of this gift is expected or implied." While Susan denied seeing the gift letter, she did not deny that it used her email address for the electronic signature and does not argue fraud or any other invalidating cause. In Ohio, a signature on a contract creates a rebuttable presumption that it was validly executed. *R.C. Olmstead, Inc. v. GBS Corp.*, 7th Dist. Mahoning No. 08 MA 83, 2009-Ohio-6808, ¶ 45. "The use of an electronic signature does not change this rebuttable presumption." *AC Asset, L.L.C. v. Mitchell*, 8th Dist. Cuyahoga No. 110818, 2022-Ohio-1763, ¶ 32. Furthermore, following the sale of the Turning Leaf home, Wendy testified that she retained a sum of money, approximately $20,000 used to purchase furniture.

{¶26} On appeal, Susan attempts to dismantle the elements necessary for a gift. To establish an inter vivos gift, there must be evidence of the following essential elements: (1) intent of the donor to make an immediate gift, (2) delivery of the property to the donee, and (3) acceptance of the gift by the donee. *Sieber v. Sieber*, 12th Dist. Butler Nos. CA201-05-106 and CA2014-05-114, 2015-Ohio-2315, ¶ 23, quoting *Casper v. Casper*, 12th Dist. Warren Nos. CA2012-12-128 and CA2012-12-129, 2013-Ohio-4329, ¶ 12. The donee has the burden of proving an inter vivos gift by clear and convincing evidence. *In re Estate of Lilley*, 12th Dist. Warren Nos. CA2005-08-091, CA2005-08-092, CA2005-08-095, and CA2005-08-096, 2006-Ohio-5510, ¶ 28. However, the existence of an inter vivos gift is ordinarily a question of fact best made by the trial court. *Id.* at ¶ 30.

{¶27} In support, Susan testified that she never intended to gift the "bridge loan" to

Wendy and Jeremy and that she never signed the gift letter. She further denied delivering the purported gift and argues that Wendy and Jeremy never showed any evidence of acceptance of the gift. Yet it does not go unnoticed there is no document referencing a "bridge loan."

{¶28} However, there was also evidence that Jeremy placed a $96,274.56 down payment on the Cheltenham home in the form of a cashier's check. Jeremy testified Susan provided these funds, which he stated were used as down payment of the Cheltenham home, thereby satisfying his delivery and acceptance of those funds. While Susan disputes possessing donative intent, Jeremy presented such evidence in the gift letter, which stated that the gift was intended to be applied to the purchase of the Cheltenham home and that "no repayment of this gift is expected or implied." Jeremy then purchased the Cheltenham home, which was secured by a mortgage. Contrary to her claims otherwise, there is evidence to support the trial court's determination as to whether the "bridge loan" was a gift.

{¶29} Susan's argument on appeal does not focus on the claims she raises below with respect to breach of contract and merely notes that the trial court denied her claims for promissory estoppel and unjust enrichment only because the trial court determined that the "bridge loan" was a gift. She fails to elaborate on the trial court's finding that the "evidence was void of any evidence to prove this was a contract." She also fails to dispute the trial court's finding that the purported agreement violated the statute of frauds. Accordingly, we agree with the trial court's decision with respect to these findings that are not meaningfully addressed in this appeal.

{¶30} We further find that Susan's claims for promissory estoppel and unjust enrichment are without merit. In this case, there was conflicting testimony as to whether the "bridge loan" was a loan, a gift, or a modification of the original agreement with respect to the Turning Leaf home. When considering the amount of money Wendy and Jeremy had

already paid to Susan in conjunction with the finding that Susan had provided the gift funds, the trial court found that Susan did not suffer any injury for purposes of establishing a claim for promissory estoppel, nor did Wendy and Jeremy retain an unjust benefit for purposes of Susan's unjust enrichment claim. Based upon a thorough review of the evidence, we find the trial court did not err in ruling in favor of Wendy and Jeremy. The trier of fact was in the best position to observe the witnesses and weigh the credibility of the evidence. *Underwood v. Boeppler*, 12th Dist. Butler No. CA2014-02-055, 2015-Ohio-156, ¶ 23. Finding no err in the trial court's resolution of the disputed issues, Susan's sole assignment of error is overruled.

{¶31} Judgment affirmed.

HENDRICKSON and BYRNE, JJ., concur.