[Cite as *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 2016-Ohio-549.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |  |
|---|---|---|---|
| A N BROS. CORPORATION, | : | | CASE NO.  CA2015-02-021 |
| Plaintiff-Appellee, | : | | |
| | : | | O P I N I O N<br>2/16/2016 |
| - vs - | : | | |
| | : | | |
| TOTAL QUALITY LOGISTICS, LLC, et al., | : | | |
| Defendants-Appellants. | : | | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2013 CVH 0030

Santen & Hughes, Charles M. Meyer and Brian P. O'Connor, 600 Vine Street, Suite 2700, Cincinnati, Ohio 45202, for plaintiff-appellee

Lindhorst & Dreidmame Co., LPA, Barry F. Fagel and Matthew C. Curran, 312 Walnut Street, Suite 3100, Cincinnati, Ohio 45202, for defendants-appellants

**M. POWELL, P.J.**

{¶ 1}   Defendant-appellant, Total Quality Logistics, LLC ("TQL"), appeals a decision of the Clermont County Court of Common Pleas denying its motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial in a breach of contract action brought by plaintiff-appellee, A N Bros. Corporation ("A N").

## I.  INTRODUCTION

## A. Facts

{¶ 2}   TQL is a freight broker that contracts with independent carriers to haul freight for its customers, the shippers.  A N is an independent carrier.  TQL typically charges the shipper a fee for the transportation and delivery of the shipper's load, and then contracts with a carrier to transport and deliver the load for a lower fee.

{¶ 3}   On October 21, 2009, TQL entered into a written broker/carrier agreement with A N.  Pursuant to the agreement, the compensation to transport each load was to be at a "rate mutually agreed upon in writing * * * contained in [a rate] confirmation sheet."  The agreement also provided that "rates or charges, including * * * detention, loading or unloading, fuel surcharges, or other accessorial charges * * * shall only be valid when specifically agreed to in a signed writing by the Parties."  The agreement further provided that TQL was "the sole party responsible" for paying A N and that "under no circumstances," was A N to seek payment from the shipper.

{¶ 4}   TQL subsequently contracted with a company named Mexican Cheese to transport a load of cheese valued at $127,000 from Chicago, Illinois to Laredo, Texas and then back to Chicago, for a fee of $5,600.  TQL then arranged for A N to transport the cheese.  The rate confirmation agreement between TQL and A N provided that TQL would pay A N $4,600 for the transport.  Pursuant to that agreement, A N was required to transport the cheese in a refrigerated trailer known as a reefer.  The agreement further provided, "All Accessorial charges must be pre-approved.  Unauthorized charges may not be paid, not all detention requests will be honored.  * * * [A N] must also get the agreed detention in writing."

{¶ 5}   A N picked up the load in Chicago on February 6, 2012, and transported it to Laredo in a reefer.  However, upon arrival in Laredo, the load and A N's trailer were seized and detained by the USDA and U.S. Customs authorities due to issues involving Mexican Cheese.  Neither TQL nor A N were responsible for the circumstances resulting in the seizure

and detention.

{¶ 6} Following the seizure of the load and trailer, Jose Martinez, the owner and president of A N, contacted TQL and began communicating solely with John Grimes, the TQL broker who had originally retained A N to transport the load. Grimes instructed Martinez that the truck driver was to remain with the trailer and load and make sure the cheese was kept refrigerated at the proper temperature at all times. Grimes understood this would require A N's driver to remain on site so as to keep the reefer fueled and operational. Grimes also understood A N expected to be paid for its services and reimbursed for its expenses.

{¶ 7} The trailer and load were detained from February 9, 2012, through July 25, 2012, for a total of 168 days. A N's driver remained with the trailer and load in Laredo throughout the 168 days.[1] Throughout the detention, Martinez and Grimes continuously communicated with one another with regard to the load and payment of A N as a result of the detention. Martinez advised Grimes he wanted a per diem rate of $500 plus expenses. The expenses included the fuel needed to keep the reefer operational and a hotel room and rental car for A N's driver. During the detention, Martinez was offered $425 per day but the parties never reached an agreement regarding this offer.

{¶ 8} According to Martinez, Grimes called him daily throughout the 168 days to ensure A N's driver was on site with the trailer and load and that the cheese was kept refrigerated at the right temperature. In turn, Martinez repeatedly asked Grimes to send him a new rate confirmation in writing. Grimes never sent a new written rate confirmation to Martinez, instead telling him he was working on it and that he was negotiating and talking to the shipper, Mexican Cheese. Nevertheless, Grimes regularly assured Martinez that A N

---

1. Martinez testified he went to Laredo in early April to take the place of the driver. For easiness of reading, the phrase "A N's driver" will be used throughout the opinion to refer to both the original driver and Martinez after the latter took the place of the driver.

would be paid.

{¶ 9} On July 25, 2012, U.S. Customs released the load on the condition it be delivered to a cold storage facility in Laredo. Consequently, A N's driver transported the load and unloaded it into a cold storage facility of TQL's choice in Laredo. The cheese was not spoiled and had been kept at the right temperature. Thereafter, Martinez contacted TQL to let them know the load was now in the cold storage facility. Christopher Brown, TQL's corporate counsel, advised Martinez to take a lien on the cheese. Martinez testified he did not do so based upon advice given to him by a U.S. Customs official.

{¶ 10} By letter emailed to Martinez on July 25, 2012, Grimes notified Martinez that TQL would not pay A N for the detention:

> [U]nless you take some affirmative action (i.e. a lien on the product), there is no way to ensure that you are paid for your detention you accrued. Throughout this process, TQL has attempted to facilitate an agreement between you and the customer * * * to pay for your layover. To date, no agreement has been reached. As a freight broker, TQL cannot take a lien on the product and does not own the load. Consequently, TQL has exhausted its attempt to assist you. TQL is more than willing to put you in contact with the customer so that you can pursue payment.

{¶ 11} At trial, Martinez testified he was never told during the 168 days that TQL had no intention to pay A N for the detention. Had he known, he would not have stayed in Laredo. Grimes testified that TQL never intended to pay A N for the detention because it believed Mexican Cheese would eventually pay A N. Grimes admitted that while he never told Martinez that TQL was going to pay for the detention, he also never told Martinez that TQL had no intention to pay for the detention.

{¶ 12} A N was never able to transport the load back to Chicago. TQL never paid anything to A N, including the original contract price of $4,600. Mexican Cheese never paid TQL.

## B. The Course of the Proceedings

{¶ 13} On January 7, 2013, A N filed a five-count complaint against TQL setting forth claims for breach of written contract, breach of oral contract, promissory estoppel, unjust enrichment, and quantum meruit, and seeking $120,179.54 in damages. TQL filed a Civ.R. 12(B)(6) motion to dismiss all claims of the complaint, except the claim alleging breach of written contract. The trial court denied the motion. Subsequently, TQL moved for summary judgment; A N moved for summary judgment on its breach of written contract claim and as to liability only on its remaining claims. The trial court denied both motions.

{¶ 14} A jury trial was held in July 2014. Martinez testified on behalf of A N. At the close of A N's evidence, TQL moved for a directed verdict, which the trial court denied. Subsequently, Grimes and Brown testified on behalf of TQL. Following the parties' closing arguments, the trial court gave its jury instructions. TQL's counsel then made a record of his objections to the jury instructions.

{¶ 15} On July 25, 2014, the jury returned a verdict in favor of A N on its claims for breach of oral contract, promissory estoppel, and quantum meruit, and awarded A N $101,372.00 in compensatory damages. The jury found in favor of TQL on A N's claims for breach of written contract and unjust enrichment. TQL subsequently moved for a judgment notwithstanding the verdict, or in the alternative, for a new trial. On February 9, 2015, the trial court denied the motion.

{¶ 16} TQL now appeals, raising four assignments of error. TQL's first two assignments of error will be addressed together. For purposes of this case, the 2009 broker/carrier agreement and the rate confirmation agreement constitute the parties' written contract.

## II. ANALYSIS

### A. The Trial Court Did Not Err in Denying TQL's Motions to Dismiss the

**Complaint and for Summary Judgment**

{¶ 17} In its first and second assignments of error, TQL argues that the trial court erred in denying its motions to dismiss the complaint and for summary judgment because the parties' unambiguous written contract precluded subsequent oral agreements or modifications as well as the use of the equitable theories of promissory estoppel, quantum meruit, and unjust enrichment.

{¶ 18} An appellate court reviews a trial court's decision on a Civ.R. 12(B)(6) motion to dismiss and on a motion for summary judgment de novo, independently and without deference to the decision of the trial court. *Goodwin v. T.J. Schimmoeller Trucking, Inc.*, 3d Dist. Wyandot No. 16-07-08, 2008-Ohio-163, ¶ 12. However, once a trial court denies a summary judgment motion due to the existence of genuine issues of material fact, and a subsequent trial on the merits results in a verdict in favor of the party who did not move for summary judgment, then any error in denying the summary judgment motion is rendered moot or harmless. *Jackson v. Hogeback*, 12th Dist. Butler No. CA2013-10-187, 2014-Ohio-2578, ¶ 12, citing *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 157 (1994).

{¶ 19} Essentially, "a party may not appeal an order denying summary judgment after a full trial on the merits because that order retains its interlocutory character as simply a step along the route to final judgment." *Hogeback* at *id.*; *Ortiz v. Jordan*, 562 U.S. 180, 184, 131 S.Ct. 884 (2011). Once a case proceeds to trial, the full record is developed and this record supersedes the limited record existing at the time of the summary judgment motion. *Hogeback* at *id.*; *Ortiz* at *id.*

{¶ 20} The trial court denied TQL's motion for summary judgment finding there were genuine issues of material fact regarding all of A N's claims. Because the case was subsequently submitted to a jury for a full trial on the merits, which resulted in a verdict in favor of A N, any error in denying TQL's motion for summary judgment is rendered moot or

harmless. *South v. Browning*, 12th Dist. Warren No. CA2012-09-088, 2013-Ohio-1491, ¶ 28. For the same reasons, we likewise find that any error in the trial court's denial of TQL's Civ.R. 12(B)(6) motion to dismiss the complaint is moot or harmless. *See LeRoy v. Allen, Yurasek & Merklin*, 114 Ohio St.3d 323, 2007-Ohio-3608, ¶ 14 (in order for a trial court to dismiss a complaint under Civ.R. 12[B][6], it must appear beyond a reasonable doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery).

{¶ 21} TQL's first and second assignments of error are overruled.

### B. The Trial Court Did Not Err in Denying TQL's Motion for Judgment Notwithstanding the Verdict

{¶ 22} In its third assignment of error, TQL asserts the trial court erred in denying its motion for judgment notwithstanding the verdict and raises four arguments for review.

{¶ 23} We apply a de novo standard of review to a trial court's decision on a motion for a judgment notwithstanding the verdict. *Briggs v. Franklin Pre-Release Ctr.*, 12th Dist. Madison No. CA2013-10-035, 2014-Ohio-2477, ¶ 8. A favorable ruling on such a motion is not easily obtained. *Phipps v. Internatl. Paper Co.*, 12th Dist. Clinton No. CA2013-02-003, 2013-Ohio-3994, ¶ 10. The standard for granting a motion for judgment notwithstanding the verdict is the same as that for granting a motion for directed verdict. *Choate v. Tranet, Inc.*, 12th Dist. Warren No. CA2005-09-105, 2006-Ohio-4565, ¶ 48.

{¶ 24} That is, when considering either motion, the evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made. *Phipps* at ¶ 11; *Choate* at ¶ 48. If the court finds that reasonable minds could not differ as to any determinative issue, then the court must sustain the motion. *Briggs* at ¶ 9. If, on the other hand, there is substantial competent evidence to support the nonmoving party, upon which reasonable minds might reach different conclusions, the motion must be denied. *Id.* Neither the weight

of the evidence nor the credibility of the witnesses is for the court's determination in ruling on either motion. *Nickell v. Gonzales*, 17 Ohio St.3d 136, 137 (1985).

## 1. Oral Contract

{¶ 25} TQL first argues it was entitled to a judgment notwithstanding the verdict because the parties never entered into an oral contract as they never agreed as to how much A N would be paid as a result of the detention.

{¶ 26} An oral agreement may be enforceable when the terms of the agreement are sufficiently particular. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 15. Terms of an oral contract may be determined from the parties' words, deeds, and acts, as well as their silence. *Id.* Seldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. *Depompei v. Santabarbara*, 8th Dist. Cuyahoga No. 101163, 2015-Ohio-18, ¶ 22. Rather, the goal in enforcing oral contracts is to hold people to the promises they make. *Id.*

{¶ 27} A valid contract must be specific as to its essential terms, such as the identity of the parties to be bound, the subject-matter of the contract, the consideration to be exchanged, and the price to be paid. *Turner v. Langenbrunner*, 12th Dist. Warren No. CA2003-10-099, 2004-Ohio-2814, ¶ 13. Nonetheless, when a contract for services does not specify the price to be paid, "the law invokes the standard of reasonableness, and the fair value of the services is recoverable." *Dixon v. Kittle*, 109 Ohio App. 257, 259 (4th Dist.1959) (where labor or materials are furnished upon request and no price is agreed upon, the law will imply an agreement to pay what they are reasonably worth); *Dayton White Trucks, Inc. v. Fed. Pacific Elec. Co.*, 2d Dist. Montgomery No. 4885, 1975 WL 181748, *3 (Sept. 30, 1975) (where a contract for services does not specify the price to be paid therefor, there is an implied promise to pay a reasonable price for such services).

{¶ 28} The record shows that as soon as the load was detained in Laredo, Texas,

- 8 -

Grimes instructed Martinez that A N's driver was to remain with the trailer and load and make sure the cheese was kept refrigerated at the proper temperature at all times. Grimes understood this would require A N's driver to remain on site so as to keep the reefer fueled and operational. Grimes also understood A N expected to be paid for its services and reimbursed for its expenses. As instructed, A N's driver remained with the load and made sure it was kept refrigerated at the proper temperature during the 168 days it was detained.

{¶ 29} Throughout the detention, Martinez advised Grimes he wanted a $500 per diem. Martinez was clear in his request. In turn, Grimes regularly, if not daily, called Martinez to inquire about the load. While Grimes never sent Martinez a new written rate confirming that A N would be paid $500 per day for the detention, Grimes regularly assured Martinez that A N would be paid. Throughout the detention, Grimes never told Martinez that TQL would not pay A N for carrying out TQL's requests with regard to the load. Martinez testified that based upon his communications with Grimes, it was his understanding TQL agreed to pay A N $500 per day. Martinez further testified he would not have kept his truck and trailer in Laredo, had he believed A N would not be paid.

{¶ 30} In view of the entire record and construing the evidence adduced at trial most strongly in favor of A N, we find that the trial court properly denied TQL's motion for a judgment notwithstanding the verdict upon the issue of oral contract. Grimes' requests to and communications with Martinez throughout the detention, coupled with their discussion of a per diem rate and Grimes' failure to inform Martinez that TQL would not pay A N for the detention, are evidence of TQL's offer to establish an oral contract with regard to the detention of the load. In turn, Martinez's decision to keep A N's driver with the load and the reefer operational and running during the detention provides evidence of A N's acceptance of the oral contract between the parties. Whether a price term had been agreed upon, and if not, the reasonable value of the services rendered by A N, were questions for the jury. *See*

*Dixon*, 109 Ohio App. at 260 (where, upon request, one does work for another, which has been accepted by the other party or has benefited him, the fair value of the services is recoverable).

## 2. Promissory Estoppel

{¶ 31} TQL next argues it was entitled to a judgment notwithstanding the verdict with regard to A N's promissory estoppel claim because there was no evidence TQL promised to pay A N anything, and none of TQL's representations were false, misleading, or fraudulent.

{¶ 32} Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises. *Ringhand v. Chaney*, 12th Dist. Clermont Nos. CA2013-09-072 and CA2013-09-076, 2014-Ohio-3661, ¶ 20. In order to establish a claim for promissory estoppel, a party must establish the following elements: "(1) a clear and unambiguous promise was made; (2) upon which it would be reasonable and foreseeable for the party to rely; (3) actual reliance on the promise; and (4) the party was injured as a result of the reliance." *Id.*

{¶ 33} Contrary to TQL's assertion, false, misleading, or fraudulent representations are not an element of promissory estoppel. Ohio has adopted the Restatement of the Law 2d, Contracts, Section 90 (1973), which states: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *See Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 2009-Ohio-2057; *Riddle v. Loveland*, 12th Dist. Clermont No. CA97-09-080, 1998 WL 142408 (Mar. 30, 1998).

{¶ 34} As the Fifth Appellate District stated,

> Estoppel is not actionable fraud, and must not be treated as actionable fraud. There is no need to prove intent to deceive, nor misrepresentation of fact to form the basis of an estoppel. When a party induces another to take an action, estoppel prevents the party from later taking an inconsistent position

which damages the other because of the induced action. *Paar v. Jackson Twp. Bd. of Trustees*, 5th Dist. Stark No. 2003-CA-00334, 2004-Ohio-5567, ¶ 19 (finding that plaintiff was not required to prove defendant acted fraudulently or in a misleading manner to prove promissory estoppel). We agree with the Fifth Appellate District.

{¶ 35} TQL cites two decisions of the Ohio Supreme Court in support of its assertion, *Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139 (1990); and *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143 (1990). *Frantz* dealt with equitable estoppel and is therefore not applicable here. *Frantz* at 145 (the purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice).

{¶ 36} *Karnes* involved an employer's false representations relied upon by an employee. We acknowledge that in its discussion, the supreme court stated that promissory estoppel is an "equitable doctrine designed to prevent the harm resulting from the reasonable and detrimental reliance of an employee upon the false representation of his employer," and that "[a]n essential element of any action predicated upon promissory estoppel is the detrimental reliance of the promisee upon the false representations of the promissor." *Karnes* at 142. However, in view of other supreme court's decisions regarding promissory estoppel that have not required a false representation or fraud as an element of promissory estoppel, and the court's adoption of the Restatement of the Law 2d, Contracts, and its promissory estoppel elements which do not include fraud or false representation, we interpret *Karnes*' reference to a false representation as being specific to a case which involves a false representation. *See ACE*, 2009-Ohio-2057 at ¶ 39-40 (an action for damages under promissory estoppel provides an adequate remedy for an unfulfilled *or* fraudulent promise; thus, promissory estoppel is an adequate remedy for a fraudulent oral promise *or* breach of an oral promise, absent a signed agreement). We therefore conclude that false, misleading, or fraudulent statements are not a required element of promissory estoppel.

{¶ 37} TQL also asserts it was entitled to a judgment notwithstanding the verdict with regard to A N's promissory estoppel claim because there was no evidence TQL promised to pay A N anything.

{¶ 38} Testimony at trial shows that TQL had no intention of paying A N for the detention. Grimes admitted that throughout the detention, he never told Martinez that TQL had no intention of paying A N for the detention, including in the event Mexican Cheese failed to pay for it. Testimony at trial also shows that while TQL never undertook to pay for the entire detention, it did offer at one point to pay A N $50 to $75 per day in an effort to reach a per diem agreeable to both A N and Mexican Cheese. Martinez testified that throughout the detention, Grimes regularly assured him that A N would be paid, and checked on a daily basis that A N was carrying out TQL's requests with regard to the load.

{¶ 39} In view of the entire record and construing the evidence adduced at trial most strongly in favor of A N, we find that the trial court properly denied TQL's motion for a judgment notwithstanding the verdict upon the issue of promissory estoppel.

### 3. Quantum Meruit

{¶ 40} TQL next argues it was entitled to a judgment notwithstanding the verdict with regard to A N's quantum meruit claim.

{¶ 41} Quantum meruit is an equitable remedy giving "rise to obligations imposed by law, irrespective of the intentions of the parties, in order to prevent an injustice when one party retains a benefit from another's labors." *In re Suchodolski*, 9th Dist. Lorain No. 10CA009833, 2011-Ohio-6333, ¶ 8. Quantum meruit "is generally awarded when one party confers some benefit upon another without receiving just compensation for the reasonable value of services rendered." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989).

{¶ 42} To prevail on a claim of quantum meruit, a plaintiff must show (1) he conferred

a benefit upon the defendant; (2) the defendant had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment. *In re Suchodolski* at ¶ 8. Though the elements of quantum meruit and unjust enrichment have been found to be identical, quantum meruit is a distinct claim or right of action. *Id.* The difference is the manner in which damages are computed. "In unjust enrichment, damages are conferred in the amount the defendant benefitted. In quantum meruit, damages are the measure of the value of the plaintiff's services." *Loyer v. Loyer*, 6th Dist. Huron No. H-95-068, 1996 WL 463728, *3 (Aug. 16, 1996).

**{¶ 43}** TQL first asserts that because the elements of unjust enrichment and quantum meruit are identical, and because the jury found in favor of TQL on the unjust enrichment claim, the jury could not have found in favor of A N on the quantum meruit claim. We need not consider this issue on appeal as it was not raised in TQL's motion for a new trial and is, therefore, waived for purposes of appeal. *See Wells Fargo Bank, N .A. v. Geiser*, 12th Dist. Butler No. CA2013-06-103, 2014-Ohio-3379, ¶ 10, fn. 3 (a party cannot raise new issues or legal theories for the first time on appeal and failure to raise an issue before the trial court results in the waiver of that issue for appellate purposes).

**{¶ 44}** TQL next asserts A N did not confer a benefit upon TQL as there was no evidence TQL retained any benefits from the detention of the load and A N's trailer, and TQL was never paid by Mexican Cheese for the load.

**{¶ 45}** Whether TQL retained a benefit from A N's actions in preserving the load should not be judged solely in monetary terms. The record shows that A N was willing to preserve the load in its reefer during the entire 168-day detention, and in fact did just that. When the load was eventually delivered to a cold storage facility, the cheese was not spoiled and had been kept at the right temperature. Consequently, we agree with the trial court that "the benefit conferred upon TQL was that it kept a good relationship with it customer,

- 13 -

Mexican Cheese[.]" Additionally, A N's preservation of the cheese likely benefitted TQL in that TQL did not incur a liability to Mexican Cheese as the cheese was not spoiled after the 168-day detention. TQL's conduct certainly suggests it perceived some benefit from A N's services given its insistence that A N keep its driver with the load and prevent the spoliation of the cheese.

{¶ 46} Lastly, TQL asserts A N did not prove its quantum meruit claim because it failed to show TQL knew or should have known that TQL was committed to pay A N for the detention.

{¶ 47} As stated above, one of the elements of quantum meruit is the defendant's retention of the benefit under circumstances where it would be unjust to do so without payment. *In re Suchodolski*, 2011-Ohio-6333 at ¶ 8. Evidence at trial shows that throughout the detention, TQL sought Mexican Cheese to pay A N for the detention and told A N of its efforts to secure the money from Mexican Cheese. While Grimes testified TQL never undertook to pay for the detention, TQL also never told A N throughout the 168 days it had no intention to pay A N for the detention in the event an agreement could not be reached with Mexican Cheese. Rather, TQL regularly assured A N it would be paid for the detention. In fact, Martinez testified that during early stages of the detention, Grimes called him after talking to Mexican Cheese, stating, "okay, Jose, I got you for the $500 and we [are] going to do that." Martinez also testified that later on during the detention, TQL offered to pay $50 to $75 per day for the detention in an effort to reach a per diem agreeable to A N and Mexican Cheese.

{¶ 48} In view of the entire record and construing the evidence adduced at trial most strongly in favor of A N, we find that the trial court properly denied TQL's motion for a judgment notwithstanding the verdict upon the issue of quantum meruit.

### 4. Damages

{¶ 49} Finally, TQL argues it was entitled to a judgment notwithstanding the verdict because A N's damages were speculative. TQL asserts A N failed to present any evidence of lost profits and provided no basis for its $500 per diem request and why such amount was reasonable.

{¶ 50} We note at the outset that A N did not seek to recover lost profits. Rather, A N only sought to recover compensatory damages incurred as a result of the detention. Consequently, a decision of the Eighth Appellate District dealing with lost profits and cited by TQL in support of its argument is not applicable here. *See Kinetico, Inc. v. Indep. Ohio Nail Co.*, 19 Ohio App.3d 26 (8th Dist.1984).

{¶ 51} Following the delivery of the load to a cold storage facility on July 25, 2012, and subsequently in its complaint, A N sought $120,179.54 in damages, which included a $500 per diem for the 168-day detention and the expenses incurred by A N as a result of the detention. Those expenses consisted of the fuel needed to keep the reefer operational so that the cheese would not spoil, and a hotel room and rental car for A N's driver. At trial, A N's exhibits 8 to 10 were admitted into evidence. The exhibits detail the expenses incurred and paid by A N for the fuel ($15,072), the hotel ($7,948.83), and the rental car ($8,558.71).

{¶ 52} With regard to the $500 per diem, Martinez testified it included $250 per day for A N's driver, including after Martinez took the place of the driver in Laredo. The other $250 included loan payments for the truck and trailer, truck insurance, parking space for the truck in Chicago regardless of whether it was used, fuel tax, and highway tax. Martinez testified that the loan for the truck was about $1,200 a month, the loan for the trailer was between $800 and $900 a month, insurance for the truck was about $1,000 per month, and the parking place was about $190 a month. Martinez testified that Grimes "always told [him]" that $500 per diem "was a pretty fair rate." The admission at trial of electronic communications between Grimes and Mexican Cheese during the detention shows that

beginning late March 2012, Grimes told Mexican Cheese that the $500 per diem requested by A N was "reasonable" and "not unreasonable" considering the prolonged situation and the fact A N "has truck insurance and a truck payment to make" and "has been unable to move or make any money with this truck" for several weeks "because he is stuck on this load."

{¶ 53} While Grimes testified Martinez initially requested a $250 per diem which he increased to $500 a month later, Martinez testified he requested a $500 per diem plus expenses from the very first week of detention. Testimony at trial indicates that during the detention, Grimes asked Martinez if he would agree to a reduced per diem, based on what Mexican Cheese was willing to pay. Martinez asked Grimes to send him a new confirmation rate "and we go from there." Grimes, however, never sent a new confirmation rate.

{¶ 54} In view of the entire record and construing the evidence adduced at trial most strongly in favor of A N, we find that the trial court properly denied TQL's motion for judgment notwithstanding the verdict upon the issue of damages.

{¶ 55} TQL's third assignment of error is overruled.

**C. The Trial Court Did Not Err in Denying TQL's Motion for a New Trial**

{¶ 56} In its fourth assignment of error, TQL asserts the trial court erred in denying its motion for a new trial and raises four arguments for review.

{¶ 57} Civ.R. 59(A) sets forth nine grounds under which a party may seek a new trial and also allows a court to grant a new trial for "good cause shown." The decision to grant or deny a motion for a new trial is reviewed on appeal under an abuse of discretion standard of review. *Citibank, N.A. v. Ebbing*, 12th Dist. Butler No. CA2012-12-252, 2013-Ohio-4761, ¶ 57; *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312 (1995). An abuse of discretion in ruling on a motion for a new trial connotes an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Group, Inc.*, 109 Ohio App.3d 312, 325 (12th Dist.1996).

### 1. Jury Instructions

{¶ 58} TQL first challenges the trial court's jury instructions. Specifically, TQL asserts the trial court improperly instructed the jury with regard to implied contract, promissory estoppel, and quantum meruit. TQL also challenges the trial court's failure to give jury instructions required by TQL.

{¶ 59} "A trial court has the duty to instruct the jury as to the applicable law on all issues presented in the case that are supported by the evidence." *Silver v. Jewish Home of Cincinnati*, 190 Ohio App.3d 549, 2010-Ohio-5314, ¶ 80 (12th Dist.). Determining whether a jury instruction is relevant rests within the sound discretion of the trial court. *Id.* When considering the appropriateness of a jury instruction, or when a specific jury instruction is in dispute, a reviewing court must examine the instructions as a whole. *Enderle v. Zettler*, 12th Dist. Butler No. CA2005-11-484, 2006-Ohio-4326, ¶ 36. "If, taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled." *Withers v. Mercy Hosp. of Fairfield*, 12th Dist. Butler No. CA2010-02-033, 2010-Ohio-6431, ¶ 17.

### a. The Trial Court's Jury Instruction on Implied Contract

{¶ 60} TQL first asserts the trial court erred in instructing the jury on implied contract as it was never pled by A N in its complaint.

{¶ 61} The trial court instructed the jury as follows: "A contract may be express or implied. An express contract is created by the words or writings of the parties. An implied contract arises from the parties['] act or conduct." The trial court's jury instruction on implied contract is identical to the one contained in Section 501.03 of the Ohio Jury Instructions. Although not mandatory, Ohio Jury Instructions are authoritative and generally followed and applied by Ohio courts. *See, e.g., State v. Jordan*, 11th Dist. Lake No. 2009-L-006, 2009-

Ohio-6152.

{¶ 62} The trial court denied TQL's motion for a new trial on this issue on the ground that "[a] contract implied in fact may be proved by showing that the circumstances surrounding the parties' transactions make it reasonably certain that an agreement was intended. Count II of the Complaint alleges breach of an oral contract. An oral contract is an implied contract."

{¶ 63} "In contracts implied in fact, the meeting of the minds is shown by the surrounding circumstances which make it inferable that a contract exists between the parties." *Lebanon Country Manor Nursing Home v. Stiver*, 12th Dist. Warren No. 88-04-030, 1989 WL 33706, *2 (Apr. 10, 1989). Given the breach of oral contract claim in A N's complaint and the evidence at trial, the trial court did not abuse its discretion in instructing the jury on implied contract. The jury instruction is neither prejudicial nor misleading.

**b. The Trial Court's Jury Instruction on Promissory Estoppel**

{¶ 64} TQL next challenges the trial court's jury instruction on promissory estoppel on the grounds it (1) wrongly instructed the jury to find promissory estoppel by the preponderance of the evidence rather than by clear and convincing evidence, (2) failed to require the jury to find TQL's alleged representations were false and/or misleading, and (3) failed to require the jury to find the alleged promises were clear and unambiguous.

{¶ 65} We are puzzled by TQL's assertion that the trial court wrongly instructed the jury on the burden of proof, and equally puzzled by the trial court's finding "it was not error for the court to instruct the jury that it had to find promissory estoppel by a preponderance of the evidence," given the trial court's jury instruction: "In order to find that the Plaintiff is entitled to recover under the doctrine of promissory estoppel *you must find by clear and convincing*

*evidence* that [the following three elements are met.]"  (Emphasis added.)[2]

{¶ 66} With regard to the trial court's failure to require the jury to find that TQL's alleged representations were false and/or misleading, we once again state that false, misleading, or fraudulent statements are not an element of promissory estoppel, and the trial court did not err in failing to so instruct.

{¶ 67} With regard to the trial court's failure to require the jury to find the alleged promises were clear and unambiguous, we acknowledge that this court has consistently required that a promise be "clear and unambiguous" in order to prove promissory estoppel. *See, e.g., Ringhand*, 2014-Ohio-3661.  However, we note the Restatement of the Law 2d, Contracts, as adopted by the Ohio Supreme Court, does not require the promise to be "clear and unambiguous."  Rather, the promise only need be one the promisor "should reasonably expect to induce action or forbearance."  In addition, the supreme court has never added the "clear and unambiguous" language to the doctrine of promissory estoppel.  The trial court, therefore, did not abuse its discretion in instructing the jury on promissory estoppel in the manner it did.

### c.  The Trial Court's Jury Instruction on Quantum Meruit

{¶ 68} TQL next asserts the trial court improperly instructed the jury with regard to quantum meruit.  TQL first argues a jury instruction on quantum meruit was not necessary as the elements of quantum meruit and unjust enrichment are identical.  However, as we stated earlier, quantum meruit is a distinct claim or right of action and the damages under the

---

2. We note that in addressing TQL's argument, A N cites to the comment in the Ohio Jury Instructions on promissory estoppel.  The comment states that given the fact "[t]hree Ohio Court of Appeals cases require a clear and convincing standard to prove promissory estoppel[,]" whereas "[t]he majority of Ohio courts appear to require a preponderance of the evidence standard to prove promissory estoppel[,]" "The Committee believes a preponderance of the evidence is the appropriate standard."  The comment was last revised in February 2009. Research on the issue indicates that five Ohio Appellate Districts now require a clear and convincing standard to prove promissory estoppel (to wit, the Third, Fourth, Fifth, Ninth, and Eleventh Appellate Districts) whereas only the Eighth and Tenth Appellate Districts require a preponderance of the evidence standard.

equitable theories are computed differently. In addition, quantum meruit was properly pled in A N's complaint. The trial court, therefore, did not abuse its discretion in instructing the jury on quantum meruit.

{¶ 69} TQL also argues the trial court's instruction on quantum meruit was confusing and highly prejudicial because "it did not instruct the jury that [A N] had to prove that TQL expected payment to [A N] to be 'from TQL,' not some other party like Mexican Cheese." The challenged jury instruction reads as follows:

> Separate and apart from the Plaintiff's other claims, the Plaintiff claims that it is entitled to recover the reasonable value of the services it performed for the benefit of the Defendant. Regardless of whether it has been established that a contract exists between the Plaintiff and the Defendant, Plaintiff may recover the reasonable value of these services if you find by the greater weight of the evidence that (A) the Plaintiff performed services for the Defendant's benefit and with the Defendant's knowledge, and (B) *the Defendant knew or should have known that the services were performed with the expectation of payment of reasonable value*, and (C) the Defendant had a reasonable opportunity to prevent the Plaintiff from performing those services prior to them being rendered by the Plaintiff.

(Emphasis added.)

{¶ 70} We find the trial court did not abuse its discretion in providing the foregoing instruction to the jury. It is undisputed that A N dealt exclusively with TQL from the time the load left Chicago on February 6, 2012, to the time it was delivered to a cold storage facility in Laredo on July 25, 2012. On the very first day the load was detained, TQL instructed A N to preserve the load by requiring that A N's driver remain with the trailer and load and make sure the cheese was kept refrigerated at the proper temperature at all times. Subsequently, TQL regularly, if not daily, inquired about the load. While TQL unsuccessfully sought Mexican Cheese to pay A N for the detention and told A N of its efforts to secure the money from Mexican Cheese, TQL never told A N throughout the 168 days that it had no intention to pay A N for the detention in the event an agreement could not be reached with Mexican

Cheese. Rather, TQL regularly assured A N it would be paid for the detention. In addition, the written broker/carrier agreement between TQL and A N provided that TQL was "the sole party responsible" for paying A N and that "under no circumstances," was A N to seek payment from the shipper, in this case Mexican Cheese. We find the jury instruction was neither prejudicial nor misleading.

### d. The Trial Court's Failure to Give Jury Instructions Requested by TQL

{¶ 71} In challenging the trial court's jury instructions, TQL also asserts the court erred in failing to give several jury instructions requested by TQL, including two regarding damages.

{¶ 72} An appellate court will reverse a trial court's refusal to give a proposed jury instruction only if the trial court abused its discretion by failing to give the requested instruction and the complaining party was prejudiced as a result. *Enderle*, 2006-Ohio-4326 at ¶ 37. A trial court is not required to give a proposed jury instruction merely because counsel submitted it. *Silver*, 2010-Ohio-5314 at ¶ 90.

{¶ 73} The trial court denied TQL's motion for a new trial on this issue on the ground TQL failed to present "any arguments demonstrating that the court's failure to give the above instructions resulted in a manifest injustice or that the verdict returned was against the manifest weight of the evidence. Accordingly, TQL is not entitled to a new trial on these bases." TQL's motion for a new trial never explained how it was prejudiced as a result of the trial court's refusal to give the requested jury instructions. Therefore, the trial court did not abuse its discretion by failing to give the requested jury instructions.

### 2. Hearsay

{¶ 74} TQL next argues the trial court improperly allowed inadmissible hearsay into evidence, to wit, Martinez's testimony that a U.S. Customs official told him he could not secure a lien on the load and the reasons why he could not. TQL asserts this testimony was

offered for the truth of the matter asserted, and thus it is entitled to a new trial.

**{¶ 75}** Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is generally inadmissible. *Thompson v. Cannon*, 12th Dist. Fayette No. CA2015-02-003, 2015-Ohio-2893, ¶ 34; Evid.R. 801(C); Evid.R. 802. We find that Martinez's testimony as to what a government official told him about his inability to place a lien on the load was not hearsay as it was not admitted for the truth of the matter asserted. Rather, the testimony was simply admitted to explain why A N did not seek to place a lien on the load. The trial court, therefore, did not abuse its discretion in denying TQL's motion for a new trial on this ground.

### 3. The "Golden Rule" Argument

**{¶ 76}** TQL next argues the trial court erred in denying its motion for a new trial based upon the misconduct of A N's counsel. TQL asserts A N's counsel made a "Golden Rule" argument during closing arguments when counsel asked the jury to "[p]ut yourself in Mr. Martinez's position as the owner of a small business."

**{¶ 77}** It is axiomatic that great latitude is afforded counsel in the presentation of closing argument to the jury. *Pang v. Minch*, 53 Ohio St.3d 186, 194 (1990). Moreover, the determination of whether permissible bounds of closing argument have been exceeded is a discretionary function to be performed by the trial court. *Id.* Absent an abuse of discretion, the trial court's determination will not be reversed on appeal. *Id.*

**{¶ 78}** A "Golden Rule" argument exists when counsel appeals to the jurors to abandon their position of impartiality by placing themselves in the place of one of the parties. *Cooley v. Leaseway Transp. Co. USA*, 8th Dist. Cuyahoga Nos. 62198 and 62732, 1993 WL 172988, *6 (May 20, 1993). Such arguments, while generally prohibited, are no longer per se prejudicial so as to warrant a new trial. *Id.*

**{¶ 79}** The record shows that A N's counsel began his closing argument as follows:

So let's talk a little bit about the case? You know, * * * I'm kind of a common sense type person. And you know, I had to keep asking myself the question, Why would a small business like An Bros. that only has six trucks, six drivers allows one of its trucks and drivers to be out of commission for almost 6 months, a half a year, unless it had some good reason to think it was going to get paid for it. Put yourself in Mr. Martinez's position as the owner of a small business.

Defense counsel immediately objected and the trial court told A N's counsel, "I don't think you can ask the jurors to put yourself in the position of the Plaintiff. You can talk about the evidence you believe shows[.]"

{¶ 80} After reviewing A N's counsel's closing argument in its entirety, we agree with the trial court that the isolated statement did not result in a manifest injustice. The record fails to show that A N's counsel's arguably improper statement was so reprehensible or heinous as to constitute prejudice. *Cooley*, 1993 WL 172988 at *6. We note the trial court implicitly sustained defense counsel's objection by cautioning A N's counsel he could not ask the jury to put itself in Martinez's position. In addition, the trial court later instructed the jurors that closing arguments were not evidence, and that they were to "determine this case as litigation between persons of equal standing of the community. You should not be influenced or affected in any way by any thoughts or ideas you may have as to the financial standing of any party to its litigation. Such matters have no proper place in the case of this kind." The trial court, therefore, did not abuse its discretion in denying TQL's motion for a new trial on this ground.

### 4. Equitable Theories

{¶ 81} Finally, TQL argues the trial court erred in allowing testimony on the equitable theories because A N's claims were covered by the parties' express written contract. However, A N's claims for promissory estoppel, unjust enrichment, and quantum meruit were based on TQL's oral promise A N would be paid for the services it provided and the

- 23 -

expenses it incurred as a result of the detention, and were not based on the parties' written contract. TQL is therefore not entitled to a new trial on this ground.

{¶ 82} In light of all of the foregoing, we find the trial court did not abuse its discretion in denying TQL's motion for a new trial. TQL's fourth assignment of error is overruled.

### III. CONCLUSION

{¶ 83} In light of all of the foregoing, we find that the trial court did not err in denying TQL's motions to dismiss the complaint, for summary judgment, for a judgment notwithstanding the verdict, or for a new trial.

{¶ 84} Judgment affirmed.

HENDRICKSON, J., concurs.

RINGLAND, J., concurs in part and dissents in part.

**RINGLAND, J., concurring in part and dissenting in part.**

{¶ 85} While I agree with the majority's ultimate resolution of the appeal, I have reservations about upholding the oral contract covering payment of A N's $500 per diem rate plus expenses for the duration of the load's detention. Given the evidence presented in the case, the existence of an oral contract is arguably too tenuous to endorse.

{¶ 86} In order for an enforceable contract to exist, the evidence must establish a meeting of the minds among the parties to the contract. *Noroski v. Fallet*, 2 Ohio St.3d 77, 79 (1982). In addition, a valid contract must state its essential terms with certainty, including subject matter, the identity of the parties, consideration, and price. *Allied Erecting & Dismantling Co. v. Uneco Realty Co.*, 146 Ohio App.3d 136, 142, 2001-Ohio-3387 (7th Dist.).

{¶ 87} In the case at bar, the evidence indicates that the per diem rate and reimbursable expenses were contentiously negotiated throughout the 168-day detention

period. No agreement was ever reached. *Spoerke v. Abruzzo*, 11th Dist. Lake No. 2013-L-093, 2014-Ohio-1362, ¶ 34-35. Consequently, the parties failed to reach a meeting of the minds sufficient to bind them on an essential term of the proposed oral contract, namely, price. *Id.* While A N may have been justified in expecting to be paid for its efforts during the detention, I am unconvinced that the theory of breach of oral contract was a legally appropriate avenue for relief. *Ireton v. JTD Realty Invests., LLC*, 12th Dist. Clermont No. CA2010-04-023, 2011-Ohio-670, ¶ 38 ("The existence of an enforceable contract is a prerequisite to a claim for breach of contract").

{¶ 88} Nonetheless, I believe A N was entitled to recover damages in quasi-contract and/or equity. Thus, despite my reservations concerning the oral contract, I believe the judgment reached by the majority is correct. I therefore respectfully dissent from the majority's ruling upholding the alleged oral contract in the third assignment of error, and concur with the remainder of the majority opinion.